UNION PACIFIC RAILROAD
COMPANY, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

General Electric Company, et
al., Intervenors.

No. 86–1626.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 22, 1988.

Decided Feb. 7, 1989.

Charles A. Miller, with whom J. Michael Hemmer, Bruce N. Kuhlik, Washington, D.C., Joseph D. Anthofer, Fred R. Birkholz, Middleburg, Fla., Robert T. Opal, Chicago, Ill., John A. Daily, Anne E. Treadway, Philadelphia, Pa., Carol A. Harris, San Francisco, Cal., Richard W. Kienle, Roanoke, Va., and Guy Vitello, Chicago, Ill., were on the briefs, for petitioner and intervening railroads. Lawrence E. Wzorek and Michael Boudin, Washington, D.C., also entered appearances for petitioner and intervening railroads.

Charles A. Stark, Atty., I.C.C. with whom Robert S. Burk, Gen. Counsel, Henri F. Rush, Deputy Gen. Counsel, and Robert J. Grady, Attorney, ICC, and John J. Powers, III, Atty., Dept. of Justice, and Henry A. Gill, Atty., Dept. of Energy, Washington, D.C., were on the joint brief, for respondents.

Michael F. McBride, with whom Leonard M. Trosten, Harry H. Voigt, and Mindy A. Buren (for Commonwealth Edison Co.), and Charles J. McCarthy and John M. Cutler, Jr. (for Carolina Power & Light Co.), and James F. Bromley and Donald Macleay, Washington, D.C., (for General Elec. Co.) were on the joint brief, for intervenors.

Before WALD, Chief Judge, and EDWARDS and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Government and utility shippers complained to the Interstate Commerce Commission that certain southern and western railroads were charging excessive rates for the transportation of spent nuclear fuel and other radioactive materials. The railroads argued that the higher rates reflected added costs attributable to the special precautions required when transporting nuclear waste. In holding for the shippers, the Commission concluded that as the added costs incurred by the railroads were unwarranted, they were engaged in an unreasonable practice in violation of section 10701(a) of the Interstate Commerce Act.

We find that the Commission erred in treating this as an unreasonable practice rather than as an unreasonable rate case. We also find that the Commission failed to provide adequate support for its conclusions that the railroads exercised market dominance over the utilities' shipments and that the rates they charged government shippers were unreasonable.

## I. BACKGROUND

This proceeding consolidates five related complaints filed with the Interstate Commerce Commission ("ICC" or "Commission") by various public utilities and the United States Departments of Energy and Defense. The complaints allege that the defendant railroads have been charging the complainants unreasonable rates for the transportation of radioactive materials in violation of section 10701a(b)(1) of the Interstate Commerce Act ("Act"), 49 U.S.C. § 10701a(b)(1) (1982). These materials are largely produced by commercial nuclear power plants operated by the utilities, the Department of Defense's fleet of nuclear-powered submarines, and the Department of Energy's ("DOE") nuclear weapons facilities.

The case was first considered by an administrative law judge ("ALJ") who determined that the railroads exercised market dominance over the transportation of both the government- and utility-generated materials. Having met this prerequisite for an examination into the reasonableness of railroad rates, 49 U.S.C. § 10701a(b)(1), the ALJ also concluded that the carriers were charging both the government and the utilities excessive rates for the shipment of nuclear waste.

On appeal, the ICC's Review Board determined that the railroads did not exercise market dominance over the commercial shipments. As a consequence, it found that the Commission lacked jurisdiction to consider the reasonableness of the rates charged the utilities. *Commonwealth Edison Co. v. Aberdeen & Rockfish R.R.*, I.C. C. Decision No. 378915 (decided May 4, 1984) ("Board Decision"). The Board affirmed the ALJ's finding that the railroads exercise market dominance over government-generated waste, but declined to decide whether the rates charged for their transportation were reasonable pending the Commission's formulation of standards for determining rate reasonableness in another case. Board Decision at 16–17.

The Board's conclusions were reviewed by the full Commission in *Commonwealth Edison Co. v. Aberdeen & Rockfish R.R.*, 2 I.C.C.2d 642 (1986) ("ICC Decision"). The ICC struck down the rates charged both the government and commercial shippers. It did so, however, not because they were found to be unreasonable, but because the Commission concluded that the railroads were engaged in an "unreasonable practice" in violation of 49 U.S.C. § 10701(a).

The ICC based its finding on the following considerations. The railroads sought to justify the challenged rates by asserting that they reflected the added costs attributable to the handling of radioactive materials, to wit: government regulations limiting the speed at which the materials could be moved to thirty-five miles per hour; the need to factor in the cost of the added delays and clean-up expenses that would be experienced in the event of derailments; increased insurance premiums; special clearance procedures required by the weight of spent fuel cask cars; and finally, the additional costs incurred in flatyard switching operations. The Commission found that all but the last of these "cost additives" were unwarranted and that the resulting ratio of charged rates to variable costs ("r/vc cost ratio") exceeded that for regular train service by several times. It concluded that the defendant railroads were "engaging in an unreasonable practice by attempting to avoid their common carrier obligation to transport the subject commodities in regular train service." ICC Decision at 666.

Accordingly, the Commission ordered the cancellation of the existing tariff provisions and prescribed rates for future shipments by the southern and western railroads at the same levels it had earlier prescribed for eastern railroads in *Trainload Rates on Radioactive Materials, Eastern Railroads ("Radioactive III")*, 362 I.C.C. 756 (1980), aff'd sub nom. *Consolidated Rail Corp. v. ICC*, 646 F.2d 642 (D.C.Cir.1981). The Commission also granted the government's request for reparations as measured by the difference between the prescribed rates and those previously paid by government shippers. ICC Decision at 672.

In their petition for review, the railroads challenge the ICC's decision on the following grounds: The Commission erred in treating this as an unreasonable practice rather than as an unreasonable rate case; it has no jurisdiction to consider the utilities' claims because its finding of market dominance over the shipment of commercially generated waste is unsupported by the record; it has failed to demonstrate that the rates charged government shippers are in fact unreasonable; and, in any event, the Commission has no jurisdiction over the claims of the government shippers because they involve preferential "section 22 rates" that are exempted from the operation of the Act by 49 U.S.C. § 10721.

## II. Discussion

### A. *Unreasonable Practice or Unreasonable Rates?*

■ Section 10701(a) of the Act provides that

[a] ... *practice related to transportation* or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title *must be reasonable.*

49 U.S.C. § 10701(a) (1982) (emphasis added). Section 10701a(b)(1) provides that

[i]f the Commission determines, *under section 10709 of this title,* that a rail carrier has market dominance *over the transportation to which a particular rate applies,* the rate established *by such carrier for such transportation* must be reasonable.

49 U.S.C. § 10701a(b)(1) (emphasis added). Thus the ICC has no jurisdiction to inquire into the reasonableness of a challenged rate unless it first finds that the railroad enjoys market dominance over the shipment of the commodities in question. There is no such bar to its exercise of jurisdiction in the case of a challenged practice.

The Commission purported to decide this case under section 10701(a), the agency's unreasonable practice jurisdiction. Yet its basis for doing so is grounded in an implicit finding that the railroads have charged unreasonable rates in violation of section 10701a(b)(1). The Commission states that

the railroads ... attempt to justify their rate levels based upon unwarranted cost additives over and above regular train costs. These additives ... have resulted in the railroads establishing tariff charges that ... produce r/vc cost ratios at a level several times that of regular train service and therefore demonstrate that the railroads are continuing to engage in an unreasonable practice with regard to the transportation of the commodities in issue.

ICC Decision at 651.

The labeling notwithstanding, form must yield to substance. Each of the five complaints consolidated in the ICC proceedings alleges that the defendant railroads are market dominant and that the rates they charge for the movement of radioactive materials are unreasonable and, therefore, in violation of section 10701a(b)(1). None alleges that the carriers are engaged in an unreasonable practice. Both the ALJ and the Review Board treated these disputes as challenges to the reasonableness of the railroads' rates. Although the ICC insists that its decision is predicated on a finding of an unreasonable practice, its analysis has all the earmarks of a rate proceeding: the Commission's analysis is largely focused on the reasonableness of the added costs on which the railroads' rates are predicated, it makes the requisite finding of market dominance, and the remedies it awards consist of rate relief in the form of prescribed rates and rebates.

We recognize that there can be a conceptual overlap between railroads' "practices" and their "rates," and therefore some lines will inevitably be drawn. Indeed, in a different context, the "practice" identified by the ICC in this case—namely, the railroads' alleged pattern of attempting to avoid their common carrier duty to transport radioactive waste—may well be subject to ICC regulation. But we do not decide that issue today. In the case before this court, the so-called "practice" is manifested *exclusively* in the level of rates that customers are charged. Thus, wherever the final line is drawn between "practices" and "rates," we conclude that the ICC's regulation here falls squarely on the side of "rates."

### B.  *Market Dominance*

■ As noted earlier, the Commission may not consider the reasonableness of rail rates unless it first "determines ... that [the] rail carrier has market dominance over the transportation to which [the] particular rate applies." The Act defines "market dominance" as the "absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies." 49 U.S.C. § 10709(a). As the railroads concede market dominance in the case of government shipments, the immediate question is whether the Commission correctly concluded that the carriers exercised market dominance over the utilities' shipments as well.

After its own examination of the data presented by the parties, the Review Board

came to a contrary conclusion. Board Decision at 11–12. It noted that while a number of nuclear power companies had not yet shipped nuclear waste currently stored at their reactor sites, "it is very clear that truck transportation has so far accounted for a large part of the private utility spent nuclear fuel transportation market" and that "[t]hose commercial utilities which currently do ship spent fuel rely exclusively on motor carriers." *Id.* at 10. The Board acknowledged that at a future date, when federal storage facilities become available, at least some of the spent fuel would be moved by rail, *id.* at 11, and concluded:

> Since it is impossible to say what the modal mix will be 5 or 10 years from now, when the federal repositories will be receiving this material, we cannot find that the railroads have market dominance over the utilities' future shipments of spent nuclear fuel.

*Id.* at 11–12.

The Commission rejected the Board's conclusion. ICC Decision at 651. Instead, it determined that the railroads possessed market dominance on the basis of the Department of Energy's *Mission Plan for the Civilian Radioactive Waste Management Program* (June 1985) ("Plan") and what it termed "the unique statutory constraints controlling the transportation of commercial spent nuclear fuel." ICC Decision at 653. The latter is a reference to the DOE's responsibility, under the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101 *et seq.*, for assuring the safe disposition of the spent nuclear fuel generated by commercial power plants.

The Commission observed that the DOE's "overriding concern," as expressed in the Plan, was with "safety rather than economic considerations," and that its program contemplated "that 70 percent of the nuclear waste will move by rail from reactors directly to a 'repository' or to a 'monitored retrievable storage facility' ... and that 30 percent will move by truck." *Id.* The ICC concluded from these observations "that there is an absence of effective intermodal competition for the traffic in issue."

Among the problems with the Commission's analysis is that the Plan is not now in effect, nor will it be before the latter part of the next decade. Even if all goes according to a design that is dependent on future congressional authorizations and funding, the projected monitored retrievable storage facility will not be ready for initial operation before 1996. Plan at 18. Furthermore, even if the Plan were to be put into immediate effect, the Commission's finding of market dominance would still be questionable. The DOE proposal calls for the future use of both rail and motor transportation because, among other reasons, "competition between modes will enhance the cost effectiveness of waste transportation." Plan at 101.

But whatever the state of intermodal competition a decade or so hence, it has no relevance to the determination the Commission is required to make at this time. Section 10701a(b)(1) speaks in the present tense. It requires a finding that the railroads *have* the requisite market dominance, not that they may acquire it at some future date. As the Commission has failed to establish the existence of a captive market, it has no jurisdiction to consider the reasonableness of the rates the railroads charge for the transportation of commercial nuclear waste.

C. *Section 22 of the Interstate Commerce Act*

■ Section 22 of the Act states:
A common carrier providing transportation subject to the jurisdiction of the Commission under ... chapter 105 of this title ... may transport property for the United States Government, a State, or municipal government without charge or at reduced rates.
49 U.S.C. § 10721(b)(1).

In the proceedings before the Commission, the railroads argued that because they charged the government "section 22 rates," that is to say, rates lower than those charged commercial shippers, the government shipments were exempt from the Act. The government complainants countered that the section 22 exemption

only applied to legitimate discounts; and further, that they were entitled to an award of reparations if, on a finding that the section 22 rates were excessive, the ICC prescribed rates at a level lower than those they had been charged. The Commission sidestepped the issue by noting that section 22 dealt with rates, not practices:

> Since we find that the railroads are engaged in an unreasonable practice with respect to the transportation of this traffic, we therefore have jurisdiction to declare the section 22 quotations unlawful and award reparations.

ICC Decision at 670 (citation omitted). Nevertheless, the Commission observed that

> to the extent the section 22 quotations were above the otherwise applicable class rates, they are not valid section 22 rates and we clearly have jurisdiction over them.

*Id.* As it is agreed that the rates charged the government are generally below those the railroads have established for commercial shippers, we will refer to them as "section 22 rates" even though the ICC takes the position that where such rates exceed appropriate levels, they are not "valid section 22 rates."

In construing section 22, the railroads rely primarily on the language of the Act as enacted in 1887. In its original form, section 22 provided that "nothing in this act shall apply to the carriage ... of property free or at reduced rates" for government entities. 24 Stat. 387 (1887). The railroads contend that this language strips the ICC of jurisdiction over section 22 rates and that subsequent modifications in the wording of the section were never intended to dilute this immunity from Commission interference. Respondents, on the other hand, contend that the clear purpose of the section in its various forms has been to exempt discounted rates offered government shippers from the Act's antidiscrimination provisions, which were designed to assure fair treatment among competing commercial shippers. They therefore assert that the section 22 exemption applies only to the antidiscrimination provisions of the Act, and does not deprive the ICC of its authority to determine whether a section 22 rate is unreasonably high.

The railroads cite two cases in support of their position. In *Public Utilities Comm'n v. United States*, 355 U.S. 534, 543 n. 10, 78 S.Ct. 446, 452 n. 10, 2 L.Ed.2d 470 (1958), the Supreme Court noted, in dicta, that section 22 "exempts transportation for the United States from the rate provisions of that Act." *Public Utilities* did not involve section 22. Rather, it concerned the authority of the State of California to regulate the negotiation, by federal procurement agents acting under federal law, of special rates for the shipment of government property within the state.

The second case on which the railroads rely is *Howe v. Allied Van Lines, Inc.*, 622 F.2d 1147 (3d Cir.1980), which involved a trucking company's liability for damage, in 1977, to a naval officer's property during the course of a move. At issue was the validity of a clause in the moving contract that limited the carriers' liability to sixty cents per pound. At the time, section 20(11) of the Act (which has subsequently been modified and recodified as 49 U.S.C. § 10730) forbade limitations on liability unless certain prerequisites, not met in *Howe*, were satisfied. The Third Circuit noted that

> [t]he early history of section 22 compels the conclusion that Congress intended to preserve the federal government's power to bargain with carriers ... free of the antidiscrimination prohibitions of the Interstate Commerce Act, and *free of regulation by the Commission* which the Act created.

*Id.* at 1154 (emphasis added). The court then found that the provisions of section 20(11) were not intended to restrict the government's freedom, under section 22, to negotiate a reduction in rate in exchange for an agreement to limit the carrier's liability for damages to property transported on behalf of the government. *Id.* at 1158. As the focus of *Howe* was on the government's right to negotiate *lower* rates without regard to the Act's antidiscrimination

prohibitions, the phrase on which the railroads rely, "free of regulation by the Commission," hardly constitutes compelling support for their position that section 22 prevents the ICC from determining whether a carrier has taken advantage of its market dominance to impose *unreasonably high* rates on government shippers.

We find the precedent cited by respondents more persuasive, although not entirely on point. In *Nashville Ry. v. Tennessee,* the Supreme Court stated that section 22 must be construed in terms of the "manifest purpose" of the Act as a whole, and that the provisions of the section permitting reduced rates and free transportation were not intended "to create an instrument by which [a] carrier [is] authorized, in its discretion, to subject interstate commerce to undue prejudice." 262 U.S. 318, 323, 43 S.Ct. 583, 585, 67 L.Ed. 999 (1923). Thus the Court set aside an order of the Tennessee Railroad and Public Utilities Commission exempting rates for carload shipments of stone and gravel for highway construction from a general increase ordered by the ICC. Although the resulting preference fell within the scope of section 22, the Court concluded that in light of the Commission's finding that the Tennessee agency's order would result in undue discrimination to the prejudice of "competing localities within or without the State, or interstate traffic," *id.,* the Commission acted properly in setting it aside.

Similarly, in *Atchison, Topeka & Santa Fe Ry. v. Aircoach Transp. Ass'n,* 253 F.2d 877 (D.C.Cir.1958), this court found that section 22 does not deprive the ICC of all jurisdiction over rate agreements between carriers and the government. In that case, air carriers alleged that certain railroads had violated the Clayton Act when bidding for military passenger traffic. The rail carriers claimed that the Commission had granted them an exemption from the operation of the antitrust laws pursuant to its authority under section 5a of the Act, now codified as 49 U.S.C. § 10706. The air carriers argued that the Clayton Act nevertheless applied in this instance because section 22 strips the ICC of all jurisdiction over contracts between carriers and the government. This court held that section 22 did not deprive the ICC of its section 5a power:

> Though not subject to the same regulation as commercial rates, all section 22 terms for governmental carriage are not, for that reason, altogether beyond the concerted action permissible under section 5a. The Act is designed primarily for commercial traffic. Section 22 is apart from this primary design. It is a concession to the Government. But the fact that section 22 reduced rates are not within the chief regulatory plan for commercial rates does not remove them from the Act entirely. The Commission itself has construed some of its regulatory power to apply to section 22 rates.

*Id.* at 882.

While respondents cite *Nashville Railway* and *Atchison, Topeka* to rebut the railroads' argument that section 22 deprives the Commission of any jurisdiction over the transportation services provided the government shippers (including jurisdiction to find the railroads engaged in an unreasonable practice), respondents rely on the ICC's own precedents to support their contention that it has authority to determine whether the section 22 rates are unreasonably high, and to award reparations if they are found to be. In *Omaha Public Power Dist. v. Burlington Northern R.R. Co.,* 3 I.C.C.2d 123, 126 (1986) (striking down rates agreed to between certain railroads and a political subdivision of the State of Nebraska), the Commission held that it had jurisdiction to consider the level of section 22 rates "where the claim is that they exceed a reasonable maximum." *See also U.S., DOE, et al. v. Baltimore & Ohio RR Co., et al.,* 364 I.C.C. 951, 964 (1981) (in enacting section 22, "Congress only intended to allow property for the United States to be transported at free or reduced rates, nothing more").

While the language of section 22 is ambiguous on this point, we find the Commission's interpretation persuasive, and thus entitled to our deference. *See K–Mart Corp. v. Cartier, Inc.,* — U.S. —, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988) (if

agency interpretation of ambiguous language permissible, it must be given judicial deference, citing *Chevron U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), and *United States v. Boyle,* 469 U.S. 241, 246 n. 4, 105 S.Ct. 687, 690 n. 4, 83 L.Ed.2d 622 (1985)). Accordingly, we find that the Commission has authority to determine whether the rates charged the government shippers by the railroads are unreasonably high and, if it finds them to be, to award the government appropriate reparations.

### D. *The Reasonableness of the Rates Charged the Government Shippers*

Having found that neither the market dominance prerequisite nor section 22 bars the ICC from considering the government shippers' challenge to the reasonableness of the railroads' rates, we now address the Commission's basis for concluding that the rates were excessive.

■ Because it insisted that it was dealing with an unreasonable practice rather than with unreasonable rates, the Commission concluded that "our guidelines for determining the reasonableness of rail captive coal rates set forth in *Coal Rate Guidelines,* [1 I.C.C.2d 520 (1985) ], are not applicable to this proceeding." ICC Decision at 654. The Commission then proceeded with an exhaustive analysis of the elements of special costs claimed by the railroads. Having found all but one category of cost additives to be unwarranted, the Commission determined that the railroads were engaged in an unreasonable practice, *id.* at 665, and that "[t]he average revenue to variable cost ratios adopted as rate ceilings for the East in *Radioactive III* should also be the presumptive rate ceilings for the transportation of the subject commodities throughout the rest of the United States." *Id.* at 671.

The Commission's approach is unacceptable. Whatever the merits of the methodology utilized in *Radioactive III,* it has since been replaced by that established by the ICC in *Coal Rate Guidelines, Nationwide,* 1 I.C.C.2d 520 (1985), *aff'd sub nom. Consolidated Rail Corp. v. U.S.,* 812 F.2d 1444 (3d Cir.1987). In *Coal Rate Guidelines,* the Commission described its new "constrained market pricing" approach as providing "the proper analytical framework for evaluating the reasonableness of rates charged on market dominant coal movements." 1 I.C.C.2d at 524. It observed that the new methodology meets the "dual objectives of providing railroads the real prospect of attaining revenue adequacy while protecting captive coal shippers from 'monopolistic' pricing practices," *id.* at 524–25, and the Commission since endorsed the application of *Coal Rate Guidelines* to non-coal shipments. *Rate Guidelines—Non–Coal Proceedings,* Ex Parte No. 347 (Sub–No. 2) (served Apr. 8, 1987), page 1–2.

■ Because this case arises under the ICC's unreasonable rate jurisdiction, we remand to the ICC for a reconsideration of the reasonableness of the rates charged the government shippers. In light of its decision in *Coal Rate Guidelines,* it is incumbent upon the Commission either to apply its new methodology or to explain why constrained market pricing is inappropriate in this instance. *See, e.g., King Broadcasting Co. v. FCC,* 860 F.2d 465, 470 (D.C.Cir. 1988) (agency must follow past practice or explain rationale for departure).

### III. CONCLUSION

We grant the petition for review and set aside the Commission's findings that the railroads were engaged in an unreasonable practice and exercised market dominance over commercial shipments of nuclear waste. We also set aside its order cancelling the existing rates, prescribing new rates, and granting reparations, and remand for reconsideration of the Commission's conclusion that the railroads have charged government shippers unreasonable rates for the transportation of nuclear waste.

*So ordered.*