**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DHX, INC.,
                              *Petitioner,*

v.

SURFACE TRANSPORTATION BOARD;
UNITED STATES OF AMERICA,
                              *Respondents,*

MATSON NAVIGATION COMPANY,
INC.; HORIZON LINES,
                *Respondent-Intervenor.*

No. 05-74592

STB No. WCC-105

OPINION

On Petition for Review of an Order of the
Surface Transportation Board

Argued and Submitted
June 4, 2007—Pasadena, California

Filed August 30, 2007

Before: Sidney R. Thomas, Raymond C. Fisher, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

10967

**COUNSEL**

Rick A. Rude (argued and on the brief), Falls Church, Virginia, and David E.R. Woolley (on the brief), Los Angeles, California, for petitioner DHX, Inc.

Craig M. Keats, Deputy General Counsel, Surface Transportation Board, Washington, D.C., (argued and on the brief);

Ellen D. Hanson, General Counsel, Surface Transportation Board, Jamie P. Rennert, Attorney, Surface Transportation Board, Thomas O. Barnett, Acting Assistant Attorney General, Department of Justice, Gerald F. Masoudi, Deputy Assistant Attorney General, Department of Justice, John J. Powers, III, Attorney, Department of Justice and Robert J. Wiggers, Attorney, Department of Justice, Washington, D.C., (on the brief) for respondents Surface Transportation Board and United States of America.

C. Jonathan Benner and Leonard L. Fleisig, Troutman Sanders LLP, Washington, D.C., (argued and on the brief); Christine J. Sommer, Troutman Sanders LLP, Washington, D.C., (on the brief) for intervenor-respondent Horizon Lines, LLC. Richard A. Allen and Scott M. Zimmerman, Zuckert, Scoutt & Rasenberger, LLP, Washington, D.C., (on the brief) for intervenor-respondent Matson Navigation Co., Inc.

## OPINION

GOULD, Circuit Judge:

DHX, Inc., a freight forwarder, petitions for review of a decision by the Surface Transportation Board ("STB") denying its complaint challenging the reasonableness of certain rates and practices of Matson Navigation Co., Inc. ("Matson"), and Sea-Land Service, Inc., now Horizon Lines, LLC ("Horizon"), two water carriers operating in the noncontiguous domestic trade between Hawaii and ports in the continental United States. We have jurisdiction pursuant to 28 U.S.C. §§ 2321 and 2342(5), and we deny the petition for review.

## I.   A

The STB is a successor to the Interstate Commerce Commission ("ICC"). In the ICC Termination Act of 1995

("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803, Congress abolished the ICC, revised the Interstate Commerce Act, and transferred regulatory functions under that Act to the STB. *See Redmond-Issaquah R.R. Pres. Ass'n v. STB*, 223 F.3d 1057, 1059 n.1 (9th Cir. 2000). In 1976, Congress began partially deregulating the industries that the ICC supervised, with a view toward promoting competition. *See* H.R. Rep. No. 104-311, at 90-93 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 793, 802-05 ("ICCTA House Report"); S. Rep. No. 104-176, at 2-4 (1995) ("ICCTA Senate Report"). The ICCTA continued this general deregulatory trend and "significantly reduce[d] regulation of surface transportation industries in this country." ICCTA Senate Report at 2.

Prior to the enactment of the ICCTA, the ICC had regulatory authority over water carriers who operated along the coasts of the continental United States or on inland waterways. Water carriers who operated outside of the continental United States, however, were regulated by the Federal Maritime Commission. The Federal Maritime Commission had regulatory authority over all "port-to-port" operations of carriers serving the "noncontiguous domestic trade" (or the "domestic offshore" trade), i.e. operations between ports in Alaska, Hawaii, or United States territories or possessions on the one hand, and other United States ports, including mainland ports, on the other hand. The ICCTA centralized all regulatory authority relating to the noncontiguous domestic trade with the STB. *See* 49 U.S.C. § 13521.

In doing so, Congress reenacted some, but not all, of the pre-ICCTA regulatory provisions regarding the noncontiguous domestic trade. In keeping with its trend toward reducing unnecessary regulation, Congress removed some of the regulatory restraints previously imposed upon water carriers. Moreover, Congress affirmatively authorized the water carriers to undertake some market-driven activities that motor and rail carriers had already been allowed to pursue after the enactment of earlier legislation. Thus, under the ICCTA,

water carriers in the noncontiguous domestic trade remain subject to three main regulatory requirements: (1) like all common carriers, they must "provide [ ] transportation or service on reasonable request," *see* 49 U.S.C. § 14101(a); (2) they are required to file tariffs, *see* 49 U.S.C. § 13702(a) and (b); and (3) they are required to maintain "reasonable" rates and practices, *see* 49 U.S.C. § 13701(a).

Despite these regulatory requirements, the ICCTA also codifies a number of rate freedoms. 49 U.S.C. § 13701(d) is a safe harbor provision, which specifies that any given rate is deemed reasonable if it falls within a "zone of reasonableness," i.e. if it is not more than 7.5% higher or 10% lower than what the rate was one year earlier. The ICCTA allows carriers explicitly to offer rates that vary with the volume of cargo offered over a specified period of time, *see* 49 U.S.C. § 13702(b)(4), and it allows carriers to enter into contracts in which the parties can waive any or all of the rights or remedies available under the Interstate Commerce Act, *see* 49 U.S.C. § 14101(b). Most importantly, with regard to DHX's petition for review, Congress repealed the statutory provisions that had prohibited unreasonable discrimination in the noncontiguous domestic water carrier trade when it enacted the ICCTA. *See* 46 U.S.C. app. § 815 (repealed 1995).

## I.  B

While some shipments via water carrier are arranged between the carrier and the shipper directly, others are handled through a third-party intermediary such as a freight forwarder. DHX is a freight forwarder, an entity that holds itself out to the general public to provide transportation of property for compensation, usually by assembling and consolidating shipments to take advantage of volume rates offered by the carrier actually hauling the goods. *See* 49 U.S.C. § 13102(8). A freight forwarder "maintains the dual status of both carrier (vis-à-vis its shippers) and shipper (vis-à-vis the underlying carrier that it uses)." *Exem. of Freight Forwarders From Tar-*

*iff Filing Requir.*, 2 S.T.B. 48, 50 (1997). Therefore, DHX is both a user and a competitor of water carriers such as Matson and Horizon to which it tenders traffic.

In the water trade, freight forwarders aggregate smaller shipments at the point of origin, buy space on a vessel, and then provide distribution services at the destination. Freight forwarders earn a profit when the rates they charge to individual shippers are lower than the water carrier's rates for small shipments, but higher than the water carrier's rates for the consolidated containerloads that the forwarders assemble. *See Chi., Milwaukee, St. Paul & Pac. R.R. v. Acme Fast Freight, Inc.*, 336 U.S. 465, 467 (1949); *N. Y. Foreign Freight Forwarders & Brokers Ass'n v. ICC*, 589 F.2d 696, 699-700 (D.C. Cir. 1979). The use of a freight forwarder can benefit the shipper by allowing it to pay rates lower than it could obtain on its own for shipments in small lots, while also benefitting the carrier, who is then free to focus its business on the high-volume containerload traffic that is most efficient for it to handle while the freight forwarder consolidates smaller shipments.

The dispute underlying this appeal is between freight forwarder DHX and the two major water carriers currently serving the Hawaiian water trade market, Matson and Horizon. The noncontiguous domestic trade between Hawaii and the mainland is experiencing a relatively low volume of traffic, resulting in excess capacity, which in turn, has exerted downward pressure on rates. *See generally* U.S. Dep't of Transp., *A Report to Congress: Competition in the Noncontiguous Domestic Maritime Trades*, at III-8-14 (1997) ("*DOT Report*").[1] This downward pressure led to rates in 1995 that were sub-

---

[1] Although the fact that there are only two major water carriers currently operating in the Hawaiian market reflects "some concentration in trade," the United States Department of Transportation's 1997 Report explains that there has been entry into and exit from the Hawaiian water carrier market over the years. *DOT Report* at III-8-14.

stantially below the inflation-adjusted rate levels in 1985. *See id.* To address these market constraints and to maximize profitable traffic, Matson and Horizon tailored their rates to attract profitable traffic away from freight forwarders as well as to draw traffic away from each other. To attract and keep larger shippers like Home Depot that can provide a steady flow of full containerload ("FCL") traffic, the water carriers began offering volume rates with "overflow provisions."

Overflow occurs when a particular shipper's traffic for a given shipment does not completely fill all the containers used for that shipment. For example, Home Depot's traffic for a particular shipment might fill more than one full container, but less than two. When such overflow occurs, the water carriers charge Home Depot a rate on the second, partially-filled container that is lower than the rate that would apply to a partially-filled container that is not part of a larger shipment by using their overflow provisions. According to the carriers, the purpose of overflow provisions is "to accommodate the needs of those regular, high-volume shippers," who are the water carriers' best customers.

As the STB explained in its June 2005 decision, once DHX recognized that lower rates were being charged for partially filled containers that were part of a larger shipment under Matson and Horizon's overflow provisions, DHX "began to go beyond the traditional role of a freight forwarder . . . and to instead target the water carriers' larger customers that already tendered volume traffic to the carriers [directly]." Specifically, DHX would take the same containerload traffic of large shippers such as Home Depot, unpack the full containers, redistribute their contents, and repack them in order to create more overflow containers than the shippers themselves would have tendered had they dealt directly with the water carriers, thereby resulting in a larger number of containers subject to the lesser overflow rates. According to Matson, at one point upwards of 98% of its revenues for overflow traffic was coming from freight forwarders rather than from the

regular direct shippers that the overflow provisions were designed to accommodate. As the STB explained in its December 2004 decision:

> When defendants [Matson and Horizon] realized they were losing some of the profits from their FCL traffic to competitors such as DHX . . . they began taking specific actions designed to induce their FCL shippers to begin dealing directly with them again. Such actions included adopting tariffs setting up more favorable rates with specific limitations such as shipper name, street address, and zip code; and entering into agreements—typically with large shippers that own the merchandise and have their own logistics departments that manage the transportation and control the routing of their cargo—providing particular rates for specified periods of time.

Despite these actions, Horizon and Matson still continued to offer substantial discounted rates to DHX and other freight forwarders in order to attract traffic away from each other.

## I.   C

DHX filed a complaint with the STB in October 1999 against Matson and Horizon challenging the reasonableness of their rates and practices. The complaint largely focused on the increases Matson and Horizon had made to their overflow rates, arguing that the increases should be declared unreasonable because they exceeded the safe-harbor zone of reasonableness contained in 49 U.S.C. § 13701(d)(1). Matson and Horizon promptly filed motions to dismiss. On December 21, 2001, the Board issued a decision denying the motions to dismiss, but agreeing with the defendants that there were "substantial shortcomings in DHX's complaint." The decision further stated that DHX would "have to flesh out the specific rates for specific shipments that it asserts are unreasonable,

and it will have to support with particularity its general claim that the carriers' practices are unlawful."

DHX filed an amended complaint on April 29, 2002, which in essence argued that any rate charged to DHX was unreasonable if it exceeded the rate charged to another customer. DHX also alleged that Matson and Horizon's tariffs did not comport with statutory and regulatory requirements. In addition to seeking more than $19 million in damages, DHX requested an order requiring the defendants to stop committing these allegedly unreasonable practices and to more openly embrace DHX's competition. All parties filed lengthy submissions before the STB with regard to DHX's contentions. On May 14, 2003, the STB issued a decision granting Horizon's motion for partial dismissal of the amended complaint. The STB rejected DHX's claim that any rate charged to DHX was per se unreasonable if it was higher than the rate charged to another customer. The Board explained:

> DHX's approach appears to be no more than a broad-ranging allegation that all of defendants' rates are discriminatory. But the discrimination remedy was repealed as to this trade in ICCTA. Thus, DHX cannot possibly prevail in its argument that the assailed rates are unreasonable even if it did show that different shippers pay different rates for arguably similar services.

While DHX's complaint was pending before the STB, DHX filed a civil complaint against Horizon in federal district court in August 2002, asserting a claim for rate discrimination. In January 2003, the district court dismissed DHX's complaint for failure to state a claim, holding that there is no "common law cause of action for rate discrimination against an ocean carrier." The district court further concluded that because the STB has primary jurisdiction to determine the lawfulness of a water carrier's conduct, particularly with regard to the reasonableness of its rates and practices, the only

relief available to DHX was whatever relief might be available under the Interstate Commerce Act as determined by the STB.

On December 15, 2004, the STB issued a decision denying the remaining claims against Matson and Horizon raised in DHX's amended complaint. Despite the "lengthy" nature of the amended complaint "with diffuse allegations ranging from discrimination and improper tariff format to deceit and fraud," the Board explained that the "principal substantive issue that remains to be resolved in this case is whether the actions that defendants took to recapture traffic and profits that they had lost to DHX constitute unreasonable practices." The STB concluded that DHX had not demonstrated that the water carriers had engaged in unreasonable practices in violation of 49 U.S.C. § 13701(a)(1). Instead, the Board concluded that:

> [I]t is not an unreasonable practice for a carrier to act in a manner, as here, designed to protect its profits and its market share from diversion to its competitors, and the Board will not interfere with actions that have not been shown to be anything more than prudent responses to competitive threats.

In reaching its decision, the STB noted that the Matson and Horizon had given DHX favorable treatment where it made business sense to do so; that DHX "is itself the beneficiary of many of the tariff provisions about which it complains"; and "that DHX's business [in the Hawaiian trade] has grown since the original complaint was filed." In addition, the STB stated that the anti-discrimination provisions of the Interstate Commerce Act had been repealed for water carriers by the ICCTA, and rejected DHX's argument that a discrimination claim could instead be based upon the general statement of transportation policy contained in 49 U.S.C. § 13101.

In a motion for reconsideration, DHX argued that either the STB had erred in finding that there was no remedy under the

Interstate Commerce Act for discriminatory pricing, or that there had to be a remedy under common law for such a claim. On June 13, 2005, the Board issued a decision denying DHX's petition, stating that there was no inconsistency between its decision and the district court's ruling concluding there was no remedy under common law. The Board also found no merit to DHX's other claims of error, including its assertions that certain of the water carriers' tariffs were deficient. This timely petition for review followed.

## II

We review decisions by the STB under the Administrative Procedure Act, 5 U.S.C. § 706(2). The agency's decision should be affirmed unless it is "arbitrary, capricious, an abuse of discretion," "otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E). "Th[is] standard is a narrow one, and the reviewing court may not substitute its judgment for that of the agency." *Public Util. Dist. No. 1 v. FEMA*, 371 F.3d 701, 706 (9th Cir. 2004) (citing *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 858 n.36 (9th Cir. 2003)); *see also In re Transcon Lines*, 89 F.3d 559, 563-64 (9th Cir. 1996).

Where there is a challenge to the agency's interpretation of the statute that it administers, we apply the analytical framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.*, 467 U.S. 837, 842-45 (1984). *See Redmond-Issaquah R.R. Pres. Ass'n*, 223 F.3d at 1061. "If the intent of Congress is clear . . . [we] must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If however, the meaning of the statute is ambiguous, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. "[T]he court does not simply impose its own construction on the statute. . . ." *Id.*

**III**

**[1]** The core of DHX's claims is that Matson and Horizon unlawfully discriminated by not giving DHX identical rates to those offered to direct FCL shippers such as Home Deport or Sears. Contrary to DHX's assertion, we conclude that Congress did not intend to retain a private cause of action against water carriers for discrimination when it enacted the ICCTA. Prior to the ICCTA, joint rail/water and motor/water rates for the noncontiguous domestic trade were subject to the rail and motor anti-discrimination provisions in former 49 U.S.C. § 10741 (repealed 1995). Port-to-port rates were governed by the anti-discrimination provisions of the Shipping Act of 1916, codified at former 46 U.S.C. app. § 815 (repealed 1995). When Congress enacted the ICCTA in 1995, it explicitly repealed the relevant Shipping Act provisions. *See* Pub. L. No. 104-88, § 335(b)(4), 109 Stat. 953-54 (repealing former 46 U.S.C. app. § 815). Moreover, while Congress specifically retained an anti-discrimination provision for rail carriers in 49 U.S.C. § 10741, it did not retain or add comparable provisions for either water carriers or motor carriers. *See* ICCTA House Report at 128, *as reprinted in* 1995 U.S.C.C.A.N. at 839-40 (containing a chart with the "disposition of existing provisions" which shows the retention of the anti-discrimination provision for rail carriers in 49 U.S.C. subtitle IV, part A, but not retaining the comparable anti-discrimination provisions for motor or water carriers in 49 U.S.C. subtitle IV, part B).

**[2]** Despite this legislative history, DHX contends that an express statutory prohibition is not necessary to support its discrimination claims. While a cause of action may be inferred in some situations when a statute is silent, we decline to infer one here where there was a prior explicit provision that Congress knowingly removed. *See Fox v. Citicorp Credit Servs., Inc.*, 15 F.3d 1507, 1512-13 (9th Cir. 1994) (refusing to assume that Congress acted contrary to its intentions when it repealed a statutory provision and enacted no substitute); *see also Union Pac. R.R. Co. v. ICC*, 867 F.2d 646, 649 (D.C.

Cir. 1989) (holding that the agency could not use its authority to address an unreasonable railroad practice in order to subvert the statutory restriction against the agency examining the reasonableness of a rail rate where the railroad does not have "market dominance" over the transportation at issue).

[3] To support its position, DHX, in part, relies on language in the ICCTA House Report stating that carriers would be required to file tariffs in order to "ensure that similarly situated shippers are treated the same by carriers based on the type and volume of cargo." ICCTA House Report at 113. However, this language cannot support such a claim since Congress's clear intent in ICCTA, as well as prior legislation,**²** was to move away from a regime of strict rate equalization. *See id.* Indeed, on the same page of the House Report, Congress discusses its desire to ensure that "price watching" not result in other carriers "follow[ing] the rates of the highest priced carrier," i.e., resulting in higher rates than would otherwise be charged so that no shipper gets the benefit of discounted rates. *See id.* Regardless, DHX cannot rely on general report language to create a cause of action that is not provided for in the ICCTA. *See Fox*, 15 F.3d at 1512-13 ("[I]solated statements" within legislative history "cannot reintroduce what the Congress has eliminated."); *United States v. Rone*, 598 F.2d 564, 569 (9th Cir. 1979) ("The proper function of legislative history is to solve, and not create, an ambiguity."). Moreover, even if we were to view ICCTA as ambiguous, the

---

**²***See, e.g.*, Staggers Rail Act of 1980, Pub. L. No. 96-448, § 2, 94 Stat. 1895-96. Congress made it clear that the rail anti-discrimination provision in the Staggers Act was not to be used to preserve a regulatory regime of strict rate equalization. *See* H.R. Rep. No. 96-1430, at 104 (1980) (Conf. Rep.), *as reprinted in* 1980 U.S.C.C.A.N. 4110, 4136 ("[C]laims of unjust discrimination may not be used to hamper the development of sound economic rate and service relationships."); *see also* H.R. Rep. No. 96-1035, at 59-60 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 3978, 4004-05 (stating that the anti-discrimination provision "is intended to recognize any differences that would normally be recognized in unregulated service industries as constituting a basis for price differences" that are not anticompetitive.).

STB's conclusion that Congress repealed the prohibition against discrimination by water carriers is entitled to deference under *Chevron*. Such a conclusion is also buttressed by the Department of Transportation's own interpretation of the ICCTA. *DOT Report* at II-12 (stating that ICCTA "did not specifically prohibit discriminatory rates [by water carriers], as had the previous statute").[3]

[4] Nor is there any other basis, statutory or otherwise, on which to sustain DHX's claim of alleged discrimination. As it did before the STB, DHX argues that it may bring an action against Matson and Horizon for discriminatory rates and practices based on the general policy objectives set forth in 49 U.S.C. § 13101. Specifically, DHX cites to the language in subsection (a)(1)(D) which speaks of "reasonable rates . . . without unreasonable discrimination" and language in subsection (a)(4) that encourages "service and price competition in the noncontiguous domestic trade."[4] As the STB stated at the outset of its December 2004 analysis, the Transportation Policy articulated at 49 U.S.C. § 13101(a) "simply sets forth a variety of (sometimes conflicting) policy objectives for the agency to consider in regulating the industry." *See, e.g.*, *Balt. Gas & Elec. Co. v. United States*, 817 F.2d 108, 112, 115 (D.C. Cir. 1987) (addressing various rail transportation policies); *Global Van Lines, Inc. v. ICC*, 714 F.2d 1290, 1295-96 (5th Cir. 1983) (stating that the Transportation Policy is for general guidance and is not an independent source of rulemaking power in motor carrier cases); *accord Central Forwarding, Inc. v. ICC*, 698 F.2d 1266, 1283-84 (5th Cir. 1983). The STB correctly concluded that "a claim under the general

---

[3]We do not address DHX's argument for a discrimination-based cause of action on the basis of pre-ICCTA case law because Congress's repeal of the prohibition of discrimination by water carriers renders those precedents inconsistent with the current statutory provisions.

[4]While subsection (a)(4) was added in the ICCTA and is addressed specifically to water carriers, subsection (a)(1)(D) is not specific to water carriers, and was carried over from the Transportation Act of 1940, Pub. L. No. 76-785, 54 Stat. 898-99.

Transportation Policy alone does not provide a right of action."[5] *See also Trailer Bridge, Inc. v. Sea Star Lines, LLC*, STB Docket No. WCC-104, slip op. at 3 (STB served Dec. 10, 1999).

[5] DHX's suggestion that 49 U.S.C. § 14101(a), which sets forth the common carrier obligation, supports a cause of action for discrimination is similarly unavailing. Section 14101(a) simply directs all common carriers to handle the traffic that is tendered to them. *See Decatur County Comm'rs v. STB*, 308 F.3d 710, 715 (7th Cir. 2002) ("The statutory common carrier obligation imposes a duty upon [carriers] to 'provide transportation . . . on reasonable request.' "). It does not say that they must charge every shipper the exact same rates. Indeed, providing different customers with different rates and services is not inconsistent with a water carrier's common carrier duty to provide service to each customer upon reasonable request, if the rates charged are reasonable. *See, e.g.*, *Am. Trucking Ass'ns, Inc. v. Atchison, Topeka & Santa Fe Ry.*, 387 U.S. 397, 406 (1967) (discussing common carrier obligations and stating "[r]ates were required to be reasonable, but discrimination in the form of unequal rates as among shippers was not forbidden" at common law).

[6] The STB's May 14, 2003, holding that "DHX cannot possibly prevail in its argument that the assailed rates are unreasonable even if it did show that different shippers pay different rates for arguably similar services" because "the discrimination remedy was repealed as to this trade in the

---

[5]Moreover, as respondents point out, the language in section 13101 does not necessarily support DHX's argument. "Service and price competition in the noncontiguous domestic trade," for example, is entirely compatible with — and indeed may require — a degree of price discrimination. § 1301(a)(4). Similarly, some of the policies articulated in subsection (a)(1) — such as "sound economic conditions among carriers" and "fair wages . . . in the transportation industry" — suggest that Horizon and Matson should be allowed to take all reasonable measures to maximize their profits.

ICCTA" is not arbitrary, capricious, or an abuse of its discretion. Rather, it is supported by substantial evidence and is in accordance with law as expressed in ICCTA and congressional intent.

**IV**

**[7]** Congress's removal of any anti-discrimination provisions applicable to the water trade through its enactment of the ICCTA does not, however, mean that the STB is without authority to review for antitrust considerations as part of its statutory responsibilities. To the contrary, if the STB believed that the oligopolist shippers' pricing was aimed at eliminating competition in a manner harmful to consumers, the STB is empowered to step in and regulate any such anticompetitive behavior as part of its statutory responsibilities. *See generally Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 US. 585 (1985) (recognizing that under certain circumstances a refusal to cooperate with rivals can constitute anticompetitive conduct, thereby violating section 2 of the Sherman Act); *see also MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004) ("An offer to deal with a competitor only on unreasonable terms and conditions can amount to a practical refusal to deal.").

**[8]** Here however, the conduct DHX complains of does not appear to have been prompted by "anticompetitive malice," but rather "competitive zeal." *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004). Indeed, Matson and Horizon have not engaged in price discrimination because the rates they charge freight forwarders like DHX do not result in pricing which is "at an unprofitable level in the short run merely to exclude competition in the long run." *MetroNet*, 383 F.3d at 1133. We do not, however, address this issue further because DHX did not raise any specific antitrust claims below. Instead, we simply note that the STB possesses ample statutory authority to address and remedy any oligopolist pricing concerns arising out of the

water carriers' conduct under traditional antitrust principles. *Cf.* 49 U.S.C. §§ 10706(a)(2)(A), 11321(a), 11324; James F. Rill, *The Evolution of Modern Antitrust Among Federal Agencies*, 11 Geo. Mason L. Rev. 135, 142 (2002) (noting that the STB, while not one of the "primary federal antitrust review agencies," "ha[s] jurisdiction over [a] particular sector[ ]").

## V

**[9]** It was also not arbitrary, capricious, an abuse of discretion or contrary to law for the STB to conclude that DHX had not shown that it was subjected to unreasonable rates or practices. DHX has mistakenly equated discriminatory pricing with unreasonableness. Rates can be discriminatory without being unreasonable, or unreasonable without being discriminatory. Reasonableness denotes a range, rather than a single fixed point. *See Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951); *accord FPC v. Conway Corp.*, 426 U.S. 271, 278 (1976) (addressing price squeeze and finding that a reasonable rate can be discriminatory); *ICC v. Inland Waterways Corp.*, 319 U.S. 671, 685 (1943). As respondents argue, "DHX's theory would turn all rate discrimination automatically into unreasonable rates, and upset the longstanding distinctions." *See, e.g.*, *Davis v. Portland Seed Co.*, 264 U.S. 403, 424-25 (1924) (holding that a shipper claiming discrimination was not entitled to reparations based on the difference between the rate it was charged and the lower rate given to someone else, unless it could show consequential damages, i.e., lost sales); *see also Pennsylvania R.R. v. Int'l Coal Mining Co.*, 230 U.S. 184, 199-201 (1913).

DHX contends that the rates it was charged by Horizon and Matson were unreasonable and that it is entitled to damages whenever the rates it was charged were higher than the rates paid by another shipper. DHX claims that such a calculation constitutes "the traditional method of determining rate reasonableness and calculation of damages," and that because the STB has not replaced this traditional method with any other

rate reasonableness standards, this method along with the pertinent case law continues to apply. These rate reasonableness standards, however, are from the 1930s, prior to Congress's significant shift toward deregulation. *See, e.g.*, *United States v. N. Pac. Ry. Co.*, 288 U.S. 490, 500 (1933) (stating that rate comparisons can be used as one test of rate reasonableness, but cautioning that such a test should not be controlling). As respondents persuasively argue and the history of deregulation since then demonstrates, the notion that Congress has retained an outdated, 1930s approach to rate regulation — an approach it has labeled as "Kafkaesque," *see* ICCTA House Report at 91 — is without merit, as is the idea that the agency has not modernized its rate criteria since the 1930s.

[10] The bulk of the case law relied upon by DHX pertains to railroad rates from decades earlier. Since those decisions, the ICC and now the STB have developed a Constrained Market Pricing ("CMP") approach for assessing whether rail rates are reasonable. *See Coal Rate Guidelines, Nationwide*, 1 I.C.C. 2d 520 (1985). Under CMP, the agency's goal is to determine how much a carrier would need to charge the aggrieved shipper for its service after removing any costs associated with inefficiencies and removing cross-subsidies between different shippers. Under either of the approaches used under CMP to make this determination, the STB does not compare the challenged rate to rates charged to other shippers, because railroads are expected to engage in "differential pricing" by charging different rates to different shippers. *See Coal Rate Guidelines*, 1 I.C.C.2d at 526-27.[6] The Federal Maritime Commission has used a public utility-type approach in rate cases that assesses the carriers' total revenues to deter-

---

[6]The STB has also devised "Simplified Guidelines" that it uses in rail rate cases for which the CMP approach is not practicable. *See Rate Guidelines — Non-Coal Proceedings*, 1 S.T.B. 1004, 1020 (1996). Under these simplified guidelines, the STB does not directly look at the rates charged to other shippers, but instead looks at rate markups over costs as well as the carrier's overall revenue needs in order to determine reasonableness. This method also differs from the approach advocated by DHX.

mine whether the carrier is earning enough overall. *See Gov't of the Territory of Guam v. Sea-Land Serv., Inc.*, STB Docket No. WCC-101, at 2 (STB served Nov. 15, 2001), 2001 WL 1436500 (S.T.B.).

When Congress transferred regulation of water carriers engaged in the noncontiguous domestic trade to the STB with the 1995 enactment of the ICCTA, it did not specify whether the STB should apply the CMP approach to water carriers, follow the approach that had been used by the Federal Maritime Commission, or adopt some other approach for assessing the reasonableness of water carrier rates. The STB has advised us that it is currently examining the issue of which rate reasonableness analysis to employ with respect to water carriers in the ongoing proceedings in *Gov't of the Territory of Guam v. Sea-Land Serv., Inc.*, but neither of those parties has, like DHX, "suggested that Congress intended for the Board to revive outdated policies from the 1930s that Congress has itself criticized."

[11] To buttress its argument, DHX points to the ICC's use of a rate comparison approach to assess maximum rate reasonableness in motor carrier cases as late as the 1990s. The STB, in its May 2003 decision explained why these cases and the market cluster analysis they used were not applicable to the noncontiguous domestic water trade:

> DHX states . . . [in its] amended complaint . . . that it intends to pursue its unreasonable rate claims based on the type of market cluster analysis set forth in *Georgia-Pacific* [*Georgia-Pac. Corp.—Petition for Declaratory Order—Certain Rates & Practices of Oneida Motor Freight, Inc.*, 9 I.C.C. 2d 103 (1992)]. However, the *Georgia-Pacific* standard was developed solely to determine the reasonableness of motor carrier rates for past shipments by defunct carriers by looking at the rates of several other carriers in the market. Here, DHX wants to compare rates

that one shipper pays to a carrier with those paid by another shipper to the same carrier. Thus, even if *Georgia-Pacific* were applicable in the noncontiguous domestic trade, DHX's approach appears to be no more than a broad-ranging allegation that all of defendants' rates are discriminatory. But the discrimination remedy was repealed as to this trade in ICCTA. Thus, DHX cannot possibly prevail in its argument that the assailed rates are unreasonable even if it did show that different shippers pay different rates for arguably similar services.

Moreover, as the STB explained, "in the *Georgia-Pacific* proceeding, the Caribbean Shippers Association, Inc. (CSA), expressed concern that the cluster approach should not be used to determine the reasonableness of joint motor-water rates filed by steamship lines in the domestic offshore trade because the water portion of this trade is not highly competitive." In response to the CSA's concerns the ICC stated that "the market-rate comparison approach was not an all-purpose measure of rate reasonableness and clearly was not intended for use in a market that is not effectively competitive." *See Georgia-Pacific*, 9 I.C.C. 2d at 806, 828. DHX's argument that the *Georgia-Pacific* market cluster analysis should be used to determine rate reasonableness in this case is incorrect under current case law.

**[12]** DHX also contends that Matson and Horizon committed unreasonable practices by (1) targeting discounts to particular shippers, (2) following each other's actions, and (3) publishing incomplete or improper tariffs. The STB however, properly concluded that DHX's remaining unreasonable practice claims lacked merit, because it held that the actions taken by Matson and Horizon were reasonable and prudent business practices in dealing with a freight forwarder that is both a customer and a competitor. As the STB stated in its December 2004 decision, "it is not a unreasonable practice for a carrier to act in a manner, as here, designed to protect its profits and

its market share from diversion to its competitors, and the Board will not interfere with actions that have not been shown to be anything more than prudent responses to competitive threats."

[13] DHX contends that it was unreasonable for Matson and Horizon to restrict certain discounts to their direct shippers by offering targeted discount rates. But that conclusion is not compelled by the record. DHX is itself a beneficiary of certain targeted discount rates from both water carriers because each one is attempting to capture traffic and lure away freight forwarder business from the other through such discounted rates. Moreover, adopting DHX's position would be inconsistent with the history and purposes behind the enactment of the ICCTA and the trend toward deregulation which it represents. To preclude price discrimination on shipping rates might deter shippers from reducing rates in attempts to get new customers or to keep old ones, and such a ban on discriminatory rates would be harmful to competition and contrary to the interests of consumers. To assess such impacts requires a discriminating judgment on the industry's practices and economics. Congress has entrusted that responsibility to the STB in the first instance, and our review of the responsible agency's action is necessarily limited to assessing whether the agency has acted in a manner that is arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, or contrary to law.

Moreover, as the STB explained in its December 2004 decision, even "when motor carriers were more heavily regulated the ICC explicitly rejected claims that trucking tariffs containing rates applicable only to named shippers and receivers or to specific addresses [i.e. the same type of rates DHX complains of] were unlawfully discriminatory." If such carrier practices were explicitly found to be lawful during the period of heavier regulation proceeding the enactment of ICCTA, we need not conclude that such practices are unlawful in the current, less restrictive regulatory climate.

**[14]** DHX next contends that Horizon and Matson engaged in improper, anticompetitive behavior by watching and mirroring each other's actions. All businesses, however, monitor their competitors' pricing to see whether and how they should match or beat the discounts they are offering. Moreover, price watching is inherent in a tariff system that statutorily requires carriers to publish their common carrier rates. DHX itself monitors Matson and Horizon's tariffs to compete with them and manipulate the water carriers' tariffs to its own advantage. As DHX acknowledges, the water carriers have used such competitive information to reduce their rates in order to match or undercut each other's prices. Under such circumstances DHX has made no showing of anticompetitive conduct.

**[15]** Finally, DHX argues "that even if the discounted rates to large-volume direct shippers were not otherwise unlawful, the manner in which they were reflected in the water carriers' tariffs made them improper" by containing discounted rates that are limited to a certain shipper location or zip code, for example. However, in *Rates For a Named Shipper or Receiver*, 367 I.C.C. 959 (1984), the STB's predecessor allowed motor carriers to express rates in that precise manner in their tariffs. This policy was cited by Congress with approval in the ICCTA House Report. *See* ICCTA House Report at 91-92, *as reprinted in* 1995 U.S.C.C.A.N. at 803-04 ("The Motor Carrier Act encouraged a more competitive environment and led the ICC to change tariff filing regulations to permit tariff rate reductions and to allow carriers to establish rates for named shippers."). We reject DHX's other arguments regarding the water carriers' tariffs, concluding that they were properly rejected by the STB.

We also reject DHX's suggestion that an additional hearing is needed before the STB to address all of its claims. The record, developed over the course of five years, contains extensive written evidence and argument submitted by both parties, as demonstrated by the 2700-page, 9-volume excerpts

of record. We have previously held that the STB's standard procedures provide due process, *see Lodi Truck Serv., Inc. v. United States*, 706 F.2d 898, 901 & n.5 (9th Cir. 1983), and DHX has not shown that the STB failed to provide due process here. *See also Amador Stage Lines, Inc. v. United States*, 685 F.2d 333, 335 (9th Cir. 1982).

## VI

**[16]** For the above reasons this challenge to the STB's decisions on rates of water carriers is not within the narrow category of cases in which we are empowered to override the agency's knowledgeable exercise of its authority over the reasonableness of rates and related practices in a regulated industry. We hold that the STB's decisions denying DHX's complaint challenging the reasonableness of certain rates and practices of Matson and Horizon were not arbitrary, capricious, an abuse of discretion, or unsupported by substantial evidence. We also conclude that the STB's decisions are in accordance with law.

**PETITION FOR REVIEW DENIED.**