**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BNSF RAILWAY COMPANY;
UNION PACIFIC RAILROAD
COMPANY,
        *Plaintiffs-Appellees*,

v.

CALIFORNIA DEPARTMENT OF
TAX AND FEE
ADMINISTRATION; DAVID
BOTELHO, in his official
capacity as Acting Director of
the California Department of
Tax and Fee Administration;
XAVIER BECERRA, Attorney
General; CALIFORNIA
GOVERNOR'S OFFICE OF
EMERGENCY SERVICES;
MARK GHILARDUCCI, in his
official capacity as Director
of the California Governor's
Office of Emergency
Services,
        *Defendants-Appellants*.

No. 16-17130

D.C. No.
3:16-cv-04311-RS

OPINION

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted August 29, 2017
Pasadena, California

Filed September 13, 2018

Before:  William A. Fletcher and Sandra S. Ikuta, Circuit
Judges, and Nancy Freudenthal,[*] Chief District Judge.

Opinion by Judge W. Fletcher;
Partial Dissent by Judge Ikuta

**SUMMARY**[**]

**Transportation / Preliminary Injunction**

The panel affirmed the district court's preliminary
injunction preventing implementation of California Senate
Bill 84, which requires railroads to collect fees from
customers shipping certain hazardous materials and then to
remit those fees to California.

Railroads sued to enjoin SB 84, arguing that it violated
three federal statutes and the federal Constitution.  The
district court concluded that the railroads were likely to
succeed on the merits of their claims.  The panel held that the

---

[*] The Honorable Nancy Freudenthal, Chief United States District
Judge for the District of Wyoming, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

district court did not abuse its discretion in granting the preliminary injunction.

The panel held that, even if SB 84 imposed a fee rather than a tax, it was preempted under the Interstate Commerce Commission Termination Act because it had a direct effect on rail transportation.  The panel held that SB 84 was not protected from preemption by the Hazardous Materials Transportation Uniform Safety Act because the fees authorized by SB 84 imposed a burden on railroads that were not imposed on the trucking industry, and the fees therefore were not "fair."

The panel further held that the district court did not abuse its discretion in evaluating irreparable harm, the balance of the equities, and the public interest.  The panel therefore affirmed the district court's entry of the preliminary injunction.

Dissenting in part, Judge Ikuta disagreed with the majority's reasoning.  She wrote that the HMTA does not supersede the ICCTA and cannot save a state law regulating railroad rates from preemption.

---

## COUNSEL

Linda L. Gandara (argued), Nicholas Stern, and Carolyn Nelson Rowan, Deputy Attorneys General; Randy L. Barrow, Supervising Deputy Attorney General; Robert W. Byrne, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Sacramento, California; for Defendants-Appellants.

Raymond A. Atkins (argued), Hanna M. Chouest, and Carter G. Phillips, Sidley Austin LLP, Washington, D.C.; John F. Muller and Benjamin J. Horwich, Munger Tolles & Olson LLP, San Francisco, California; for Plaintiffs-Appellees.

**OPINION**

W. FLETCHER, Circuit Judge:

The California State Board of Equalization ("California") appeals from a preliminary injunction preventing implementation of California Senate Bill 84 ("SB 84"). Cal. Gov't Code §§ 8574.30–8574.48. SB 84 requires railroads to collect fees from customers shipping certain hazardous materials and then to remit those fees to California. *Id.* § 8574.32(a), (b). BNSF Railway Company and Union Pacific Railroad Company ("the Railroads") sued to enjoin SB 84, arguing that it violates three federal statutes and the federal Constitution. The district court found that the Railroads were likely to succeed on the merits and entered a preliminary injunction. We affirm.

I. Background

In June 2014, California's Interagency Rail Safety Working Group released a report entitled "Oil by Rail Safety in California." The working group noted an increase, both nationally and in California, in spills of oil transported by rail and concluded that California was ill prepared to handle these spills. California's Office of Emergency Services echoed these concerns in a separate report a year later. In response, the California Legislature passed SB 84. Cal. Gov't Code §§ 8574.30–8574.48.

SB 84 charges a fee to "each person owning any of the 25 most hazardous material commodities . . . that are transported by rail in California." *Id.* § 8574.32(a). The fee is currently established at $45.00 per loaded rail car. 19 Cal. Code Regs. § 2704(b). If the rail car is loaded in California, the fee is imposed when the material is loaded onto the car. If the car is loaded outside California, the fee is imposed when the car enters the state. Cal. Gov't Code § 8574.32(b)(1). The same fee is charged irrespective of the distance traveled in California. A railroad may charge shippers an additional fee of up to five percent of the established fee "to offset the administrative cost to collect the fee." *Id.* § 8574.32(b)(4)(B).

Railroads are required to collect the established fee from shippers of the hazardous materials and to remit collected fees to the state on a quarterly basis. *Id.* § 8574.32(b)(1); *id.* § 8574.38; 19 Cal. Code Regs. § 2704(c). Failure to collect and remit the fees can result in civil or criminal sanctions. Cal. Gov't Code § 8574.36; Cal. Rev. & Tax. Code §§ 55042, 55121, 55363. The fees are deposited in the Regional Railroad Accident Preparedness and Immediate Response Fund ("the Fund"). Cal. Gov't Code § 8574.44(a), (b). After taking into account administrative expenses, money from the Fund is to be used to reimburse a state fund that provided start-up costs for the SB 84 program. Remaining money is to be used, *inter alia*, to pay for "[p]lanning, developing, and maintaining a capability" for emergency responses to "railroad accidents involving rail cars carrying hazardous materials," and to "releases of hazardous materials from rail cars"; "[a]cquisition and maintenance of specialized equipment and supplies used to respond to a hazardous materials release from a rail car or a railroad accident involving a rail car"; "[s]upport of specialized regional

training facilities"; "[c]reation and support of a[n] . . . emergency response team"; and "[s]upport for specialized training for state and local emergency response officials." *Id.* § 8574.44(d), (e)(1), (e)(2), (e)(4–7).

Emergency response equipment purchased with money from the Fund may be used to respond to hazardous material spills resulting from truck accidents. SB 84 specifically provides that such equipment may be "used for emergency response activities *unrelated to regional railroad accident preparedness and immediate response*," provided that the Fund is reimbursed for such use. *Id.* § 8574.44(i) (emphasis added). According to a February 10, 2016, memorandum from the Governor's Office of Emergency Services, the "maintenance cost" of using such equipment is to be reimbursed by "local agenc[ies]" rather than by truck owners or operators responsible for the accident.

The Railroads contend that SB 84 violates three federal statutes—the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803 (1995); the Hazardous Materials Transportation Act ("HMTA"), Pub. L. No. 93-633, tit. I, 88 Stat. 2156 (1975); and the Railroad Revitalization and Regulatory Reform Act of 1976 ("4-R Act"), Pub. L. No. 94-210, 90 Stat. 31 (1976). They contend, further, that SB 84 violates the dormant Commerce Clause.

"We review a district court's grant or denial of a preliminary injunction for abuse of discretion and the underlying legal principles de novo." *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011). To obtain a preliminary injunction, a party requesting the injunction must show "that he is likely to succeed on the merits, that he is

likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

For the reasons that follow, we conclude that the district court did not abuse its discretion in granting the preliminary injunction.

## II.  Discussion

### A.  Preemption under the ICCTA

The 4-R Act prohibits states from imposing a "tax that discriminates against a rail carrier." 49 U.S.C. § 11501(b)(4). If the assessment paid by shippers of hazardous materials is properly characterized as a "tax," the parties agree that SB 84 is preempted under the 4-R Act.   If it is properly characterized as a "fee," however, it is not preempted by the 4-R Act.   We need not reach the question whether the assessment paid by shippers is a tax or a fee under the 4-R Act because, as written, SB 84 is preempted under the ICCTA even if it is a fee.   The discussion that follows assumes that SB 84 imposes a fee.

"In the [ICCTA], Congress abolished the [Interstate Commerce Commission], revised the Interstate Commerce Act, and transferred regulatory functions under that Act to the [Surface Transportation Board]." *DHX, Inc. v. Surface Transp Bd.*, 501 F.3d 1080, 1082 (9th Cir. 2007).   The ICCTA continued a decades-long trend of deregulating railroads. *Id.*   As part of this deregulation program, the ICCTA included a broad preemption provision. Specifically, the ICCTA provides:

>The jurisdiction of the [Surface Transportation] Board over –
>
>>(1) transportation by rail carriers, and the remedies provided in this part with respect to *rates*, classifications, rules . . . , practices, routes, services, and facilities of such carriers; . . .
>>
>>. . .
>>
>>is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b) (emphasis added). This provision grants the Surface Transportation Board exclusive jurisdiction over "a wide range of *state and local* regulation of rail activity." *Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1096 (9th Cir. 2010) (emphasis added). "It is difficult to imagine a broader statement of Congress's intent to preempt *state* regulatory authority over railroad operations." *City of Auburn v. United States*, 154 F.3d 1025, 1030 (9th Cir. 1998) (citation omitted) (emphasis added).

The ICCTA does not "preempt state or local laws if they are laws of general applicability that do not unreasonably interfere with interstate commerce." *Am. Railroads*, 622 F.3d at 1097. The ICCTA "preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued

application of laws having a more remote or incidental effect on rail transportation.  What matters is the degree to which the challenged regulation burdens rail transportation[.]"  *Id.* at 1097–98 (citations and internal quotation marks omitted).

SB 84 requires shippers to pay to railroads a fee currently established at $45.00 per loaded car, and an additional fee of up to five percent of the established fee.  Because these fees are paid by shippers as part of the price for shipping hazardous materials by rail, we conclude that they are "rates" within the meaning of § 10501(b).  SB 84 is neither a law of "general applicability," nor a law with only a "remote or incidental effect on rail transportation."  SB 84 imposes fees on shippers of hazardous materials in California, but only if they ship by rail.  It thus "targets" the railroad industry. *Adrian & Blissfield R. Co. v. Vill. of Blissfield*, 550 F.3d 533, 541 (6th Cir. 2008).  Further, in requiring railroads to collect fees from shippers, SB 84 has a direct, rather than a "remote or incidental" effect on rail transportation.  *Am. Railroads*, 622 F.3d at 1097–98.

Considered in isolation, the ICCTA would preempt SB 84.  However, another federal statute, the HMTA, protects from preemption certain state, local and tribal fees related to the transportation of hazardous materials.

### B.  HMTA Protection from Preemption

In 1990, Congress substantially amended the HMTA by passing the Hazardous Materials Transportation Uniform Safety Act ("HMTUSA"). The following provision was added to the HMTA as part of the revision:

> **Fees.**—A State or political subdivision thereof or Indian tribe may not levy any fee in connection with the transportation of hazardous materials that is not equitable and not used for purposes related to the transportation of hazardous materials, including enforcement and the planning, development, and maintenance of a capability for emergency response.

Hazardous Materials Transportation Uniform Safety Act of 1990, Pub. L. 101-615, § 112(b), 104 Stat. 3244, 3260 (1990). In 1994, this provision was amended to its current form as part of an effort to "revise, codify, and enact without substantive change" certain transportation laws. Act of July 5, 1994, Pub. L. 103-272, 108 Stat. 745, 783 (1994). It now reads:

> **Fees.**—**(1)** A State, political subdivision of a State, or Indian tribe may impose a fee related to transporting hazardous material only if the fee is fair and used for a purpose related to transporting hazardous material, including enforcement and planning, developing, and maintaining a capability for emergency response.

49 U.S.C. § 5125(f)(1). California argues that SB 84 assesses a fee "for a purpose related to transporting hazardous material," that the fee is "fair," and that SB 84 is therefore authorized by the HMTA.

We will not easily conclude that one federal statute preempts another. "A party seeking to suggest that two

statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing ' "a clearly expressed congressional intention" ' that such a result should follow." *Epic Systems Corp. v. Lewis*, 138 S.Ct. 1612, 1624, ___ U.S. ___ (2018) (internal citation omitted). Specific to the ICCTA, we have written, "If an apparent conflict exists between ICCTA and a *federal* law, then the courts must strive to harmonize the two laws, giving effect to both laws if possible." *Am. Railroads*, 622 F.3d at 1097 (emphasis in original) (citing *In re Box & Me. Corp. & Town of Ayer, Mass.*, No. 33971, 2001 WL 458685, at *6 n.28 (S.T.B. Apr. 30, 2001)). The Surface Transportation Board wrote in *Town of Ayer*, "[I]f two Federal statutes are 'capable of coexistence,' the statutes should be harmonized and each should be regarded as effective unless there is a 'positive repugnancy' or an 'irreconcilable conflict' between the laws." *Id.* We owe *Chevron* deference to the STB's "guidance on the scope of ICCTA preemption." *Am. Railroads* at 1097 (citing *DHX, Inc. v. Surface Trnsprotation Bd.*, 501 F.3d 1080, 1086 (9th Cir. 2007)).

We conclude that the ICCTA and the HMTA are easily harmonized by reading § 5125(f)(1) of the HMTA to protect from preemption the fees specifically authorized in that section.

The Railroads argue on two grounds that § 5125(f)(1) does not protect the fees authorized in SB 84 from preemption by the ICCTA. First, they argue that § 5125(f)(1) does not independently authorize a State to charge fees for transportation of hazardous materials by rail. Second, they argue that the fees authorized in SB 84 are not "fair" within the meaning of § 5125(f)(1). We disagree with the first

argument but agree with the second.    We consider the arguments in turn.

### 1.  Affirmative Authorization to Charge a Fee Related to Transportation of Hazardous Materials by Rail

The Railroads argue that § 5125(f)(1) does not independently protect a State, local, or tribal fee from preemption under the ICCTA, no matter how "fair" that fee might be.    The Railroads assert that "the linchpin of California's HMTA theory—a claim that 'HMTA expressly permits states to impose fees'—is textually indefensible." Appellees' Brief at 33. The Railroads argue that the phrase "may impose a fee," contained in § 5125(f)(1), does not authorize a state to charge a fee for the transportation of hazardous materials, limited by the phrase "only if the fee is fair."  They argue that under § 5125(f)(1) a state-imposed fee for the transportation of hazardous materials must be authorized by some *other*, unspecified federal law.    The Railroads argue that the "only if" phrase of § 5125(f)(1) addresses the fees authorized by that other, unspecified federal law.  It is undisputed that there is no other federal law authorizing a State to charge a fee for the interstate transportation of hazardous materials.

We disagree with the Railroads.  The Railroads cite only *Township of Tinicum v. U.S. Department of Transportation*, 582 F.3d 482 (3d Cir. 2009), in support of their argument.  In *Tinicum*, some runways of the Philadelphia International Airport were located within the borders of the Township of Tinicum.  For many years, under an agreement between Philadelphia and the Township, Philadelphia paid the Township for use of its land as runways.  The agreement expired in 2007.  When the parties were unable to reach a

new agreement, the Township passed an ordinance assessing a tax against airlines that used runways within Township borders. *Id.* at 484.

The United States Department of Transportation ("DOT") concluded that the ordinance was preempted by the federal Anti-Head Tax Act ("AHTA"). *Id.* at 487. "Except as provided in subsection (c)," § 40116 of the AHTA prohibited States and their political subdivisions from charging four specified types of fees or taxes on air commerce. *Id.* at 486 (citing 49 U.S.C. § 40116(b)). Subsection (c) provided that a State or its political subdivision "may levy or collect a tax" on air commerce "*only if* the aircraft takes off or lands in the State or political subdivision as part of the flight." 49 U.S.C. § 40116(c) (emphasis added). Subsection (c) was a recodification of an earlier federal statute. The Township conceded that the earlier version of the statute would not have authorized the challenged tax. *Tinicum*, 582 F.3d at 487. The recodification stated that it made no "substantive change" from the prior law. *Id.* at 486. "Bas[ing] its decision primarily on the recodification law," the DOT concluded that subsection (c) was not intended as a change of law, and therefore did not authorize the tax. *Id.* at 487. The Third Circuit denied the Township's petition for review of the DOT's decision. Without relying on *Chevron* deference, the court agreed with the DOT's interpretation of the AHTA, holding that the "may" phrase did not affirmatively authorize the collection of a tax, and that the "only if" phrase imposed a necessary but not sufficient condition for imposing the tax. *Id.* at 488–89.

We do not challenge here the correctness of the Third Circuit's decision in *Tinicum*, which agreed with the DOT's interpretation of the AHTA. But even if correct, the decision

is not applicable to the HMTA. The fees provision at issue here was enacted as part of the Hazardous Materials Transportation Uniform Safety Act of 1990. Pub. L. No. 101-615, § 112(b), 104 Stat. 3244, 3260 (1990). Like the provision at issue in *Tinicum*, the fees provision was later recodified and revised into its current form "without substantive change." Act of July 5, 1994, Pub. L. No. 103-272, 108 Stat. 745, 745, 783 (1994); *see also* Hazardous Materials Transportation Authorization Act of 1994, Pub. L. No. 103-311, § 107, 108 Stat. 1673, 1674 (1994) (redesignating the provision as subsection (g)(1) but not altering the language); Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109-59, § 7123, 119 Stat. 1144, 1907 (2005) (redesignating the provision as subsection (f)(1) but not altering the language). Here, however, unlike in *Tinicum*, there is no undisputed meaning of the earlier statute upon which we must "primarily" rely in interpreting the language. We also note that in the case before us there is no agency interpretation to which we owe *Chevron* deference.

A plain-language analysis of the HMTA tells us that § 5125(f)(1) affirmatively authorizes a State to charge a fee for transportation of hazardous materials, subject only to the qualification that the fee be "fair." The syntactical structure of § 5125(f)(1)—a person or entity "may" perform some act "only if" some criterion is satisfied—is used repeatedly and consistently in the HMTA. As used in the HMTA, the "may" phrase affirmatively authorizes the performance of the specified act by a person or entity. The "only if" phrase limits the scope of that authorization. *See, e.g.*, 49 U.S.C. § 5104(a)(1) ("A person *may represent . . . that . . . a package . . . is safe . . . only if* the package . . . meets the requirements of . . . this chapter."); *id.* § 5108(a)(3) ("A person . . . *may*

transport . . . *a package* . . . *only if* the person has a statement on file . . . ."); *id.* § 5109(a) ("A motor carrier *may transport* . . . *hazardous material only if* the carrier holds a safety permit . . . ."); *id.* § 5109(f) ("A person offering hazardous material for motor vehicle transportation . . . *may offer the material* to a motor carrier *only if* the carrier has a safety permit . . . ."); *id.* § 5109(g) ("A motor carrier *may provide transportation* . . . *only if* the carrier complies with conditions . . . ."); *id.* § 5116(a)(3) ("The Secretary *may make a grant* to a State or Indian tribe . . . *only if* . . . the State or Indian tribe certifies . . . ."); *id.* § 5116(b) ("The Secretary *may make a grant* to a State . . . *only if* the State certifies . . . ."); *id.* § 5125(f)(1) ("A State, political subdivision of a State, or Indian tribe *may impose a fee* . . . *only if* the fee is fair . . . ."). *See also Massachusetts v. U.S. Dep't of Transp.*, 93 F.3d 890, 895 (D.C. Cir. 1996) ("[Section 5125(f)(1)] permit[s] states to impose their own fees 'related to transporting hazardous material,' but only 'if the fee is fair and used for a purpose related to transporting hazardous material.' ").

Where the plain language of a provision is open to more than one interpretation, we may look to legislative history to clarify its meaning. *See United States v. Gallegos*, 613 F.3d 1211, 1214 (9th Cir. 2010). Given the consistent use of the "may" but "only if" structure throughout the HMTA, we do not believe the language of § 5125(f)(1) is ambiguous. However, because our concurring colleague believes that the statute in its current form is ambiguous, we will examine the legislative history. That history not only confirms that § 5125(f)(1) is an affirmative authorization of state-imposed fees related to the transportation of hazardous materials so long as they are "fair." It also confirms that § 5125(f)(1) was intended to protect such fees from preemption by federal laws, like the ICCTA, that regulate transportation by rail.

The HMTUSA, the source of § 5125(f)(1), was enacted in 1990 as an amendment of the HMTA.  It grew out of a variety of proposals to amend the HMTA.  *See* S. Rep. No. 101-499 at 3 (1990) (listing eight bills to amend the HMTA that were before the Senate Committee on Commerce, Science, and Transportation when the Committee considered Senate Bill 2936).   House Bill 3520, introduced by Representative Thomas Luken, was among these proposals.  H. 3520, 101st Cong. (1989).   The bill contained a provision virtually identical to the fees provision at issue here.  *Id.* § 14.

Representative Luken's bill was referred to the Committee on Energy and Commerce, of which Luken was a member. The Committee then favorably reported on the bill.  H.R. Rep. No. 101-444, pt. 1, at 1.  The Committee Report described the bill at length, including the provision that eventually became § 5125(f)(1).  The Report tells us two things.

First, the Report tells us that the predecessor to § 5125(f)(1), as originally enacted in 1990, affirmatively authorized a State to charge fees related to the transportation of hazardous materials.  The Report explained that the fees "would provide that a non-Federal governmental entity *may levy . . . fees*, but would require that . . . such . . . *fees be reasonable*[.]" H.R. Rep. No. 101-444, pt. 1, at 49 (emphasis added).  The Report "recognize[d] the critical role State and local governments must play in order to effectuate a comprehensive national hazardous materials program," and stated that state "authority . . . should properly extend to being able to fund legitimate activities directly connected with hazardous materials transportation programs."  *Id.* at 49–50.  The Report "emphasize[d]" that the bill "make[s] clear that states may adopt *and enforce* hazardous materials

laws, regulations, and other requirements that conform to the bill's requirements." *Id.* at 53–54 (emphasis in original). It noted that "[a] State's ability to enforce such [laws] includes the ability to impose, collect, and utilize . . . *fees*[.]" *Id.* (emphasis added).

Second, the Report unambiguously stated that a State's authority to charge fees under § 5125(f)(1) extended to transportation by rail. The bill as a whole was addressed to the transportation of hazardous materials by interstate transportation, including transportation by rail. *See* 49 U.S.C. § 5104 (authorizing companies to represent that a "rail freight car" contains hazardous material and prohibiting tampering with "rail freight car[s]" so designated); *id.* § 5105(b), (c) ("[T]he Secretary shall conduct a study comparing the safety of using trains . . . with the safety of using other methods of rail transportation for transporting that waste and fuel. . . . [A]fter considering the results of the study . . ., the Secretary shall prescribe amendments to existing regulations that the Secretary considers appropriate to provide for the safe rail transportation of high-level radioactive waste . . . ."); *id.* § 5107(f) ("The Secretary shall ensure that . . . railroad signalmen receive general awareness and familiarization training and safety training . . . ."); *id.* § 5108(a)(1)(B) (requiring persons transporting more than 25 kilograms of explosive material in a "rail car" to register with the government); *id.* § 5110(b) (requiring that shipping papers be kept on trains carrying hazardous materials and be presented to federal, state, or local authorities responding to "an accident or incident involving the . . . train"); *id.* § 5121(d)(2), (5) (authorizing the Secretary to issue an "out-of-service" order to "an aircraft, vessel, motor vehicle, train, railcar, locomotive, other vehicle, [etc.]").

The Report did not specifically address the preemption provision of the ICCTA because that provision was enacted in 1995, six years after the Report was written. But the bill and the Report did address preemption. A federal statute with a broad preemption provision, the Federal Railroad Safety Act ("FRSA"), was already part of federal law. *See* 49 U.S.C. § 20106. Enacted in 1970, the FRSA had been in effect for twenty-one years. The Report explained that the bill was designed "expressly to override any notion that the preemption language contained in [the FRSA] governs the regulation of hazardous materials transportation by rail and overrule any court decision that relies on the FRSA to invalidate State requirements relating to the transportation of hazardous materials by rail insofar as they conform to the requirements of this bill." H.R. Rep. No. 101-444, pt. 1, at 53–54 (1990). The Committee's explicit intent was "to make clear that States may adopt and enforce hazardous material laws, regulations, and other requirements that conform to the bill's requirements." *Id.*

House Bill 3520 never became law as House Bill 3520. Senate Bill 2936, which was eventually enacted as the HMTUSA, did not initially include a provision authorizing States to charge fees related to the transportation of hazardous materials. S. 2936, 101st Cong. (1990). However, when Senate Bill 2936 reached the House, Representative Luken proposed an "amendment in the nature of a substitute." 136 Cong. Rec. 34168 (1990). That amendment incorporated the fees provision from House Bill 3520 into the Senate Bill. 136 Cong. Rec. 34168, 34181 (1990). Senate Bill 2936, as thus amended, passed both houses and became the HMTUSA.

The preemption provision of the ICCTA is worded very broadly and generally. It provides for exclusive Surface

Transportation Board jurisdiction over "transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules . . . , practices, routes, services, and facilities of such carriers[.]" 49 U.S.C. § 10501(b)(1). Under one principle of federalism and two canons of construction, we should not read the preemption provision of the ICCTA to eliminate the protection from preemption provided by § 5125(f)(1) of the HMTA.

First, federalism entails a "traditional presumption against the federal preemption of state rules in areas of traditional state regulation." *Comm. of Mass.*, 93 F.3d at 894. One of those areas of traditional state regulation is protection of state residents from physical and environmental hazards. *See*, *e.g.*, *National Solid Wastes Management Ass'n v. Killian*, 918 F.2d 671 (7th Cir. 1990) (observing that "[e]nvironmental regulation has long been recognized as an 'historic police power[] of the States.'") (quoting *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960)), *aff'd*, 505 U.S. 88 (1992). The D.C. Circuit relied on this presumption in applying § 5125 of the HMTA to conclude that a Massachusetts bonding requirement for a hazardous waste transporter was not preempted. *Id.* ("[T]he regulation of how waste may be picked up or dropped off in a state must be thought an area of traditional state control.").

Second, "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987) (emphasis omitted) (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976)). The preemption provision of the ICCTA is broad and general, providing without differentiation for preemption of state and local regulation of

railroad "rates, classifications, rules . . . , practices, routes, services, and facilities." Section 5125(f)(1), on the other hand, is narrow and specific. Though it does not differentiate between rail and truck transportation, it protects from preemption only fees relating to the transportation of hazardous materials, and does so only if those fees are fair.

Third, "in approaching a claimed conflict [between two federal laws], we come armed with the 'strong presum[ption]' that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Systems*, 138 S.Ct. at 1624 (quoting *United States v. Fausto*, 484 U.S. 439, 452–53 (1988)). The predecessor to § 5125(f)(1) was enacted in 1990, and was recodified as § 5125(f)(1) without substantive change in 1994. The ICCTA was enacted in 1995, a year later. There is nothing in the text of the ICCTA, or in its legislative history, to indicate that Congress intended to restrict or overrule the protection from preemption provided by § 5125(f)(1). Congress knew that § 5125(f)(1) provided protection from preemption by federal law, in particular by the Federal Railroad Safety Act. That is, Congress knew that § 5125(f)(1) permitted States to impose fees related to the transportation of hazardous materials by rail, and to do so despite the FRSA. If Congress intended in the ICCTA to reverse course and no longer to permit States to impose such fees, one would expect Congress to have said so. But Congress said nothing.

### 2. Fees Must Be "Fair"

Conceding for the sake of argument that the HMTA authorizes a State to charge a fee for transportation of hazardous materials by rail so long as the fee is "fair," the

Railroads argue that the fees authorized by SB 84 are not fair within the meaning of § 5125(f)(1). They argue that SB 84 is unfair because it imposes a burden on railroads that it does not impose on the trucking industry. We agree.

According to a declaration by an expert employed by the Railroads, "railroads and trucks transport roughly equivalent amounts of hazardous materials on a ton-mile basis." The risks, and associated costs, of hazardous materials spills are substantial for both rail and trucking. SB 84 imposes costs on shippers if they ship hazardous materials by rail but not if they ship such materials by truck, thus favoring the trucking industry at the expense of railroads.

Rail accidents are less frequent than trucking accidents, but some rail accidents are catastrophic. As stated by a California Legislative Analyst's Office report released prior to the passage of SB 84, "a rail accident is potentially of a much larger scale when it does occur." For example, the report referred to a 1991 train derailment in Dunsmuir, California that spilled "19,000 gallons of pesticide into the Sacramento River." The spilled pesticide "killed fish and vegetation along the river for forty miles and caused wide-spread health problems for area residents." *Union Pacific Rr. Co. v. California Public Utilities Comm'n*, 346 F.3d 851, 856 (9th Cir. 2003). The railroad settled a federal suit arising out of the spill for $38,000,000. As a further example, an Addendum to a Notice of Emergency Rulemaking issued by the California Governor's Office referred to a "devastating derailment in Mosier, Oregon" in 2016. "[A]n estimated 42,000 gallons of crude oil spilled and rapidly caught fire. The nearby communities, including an elementary school, had to be evacuated. The oil entered the nearby waterway

and the full extent of the damage to the environment is not fully known."

Trucking accidents, on the other hand, are more frequent but are smaller in scale. According to the U.S. Department of Transportation, from 2010 to 2014 in the United States there were 67,639 "incidents" involving transportation of hazardous materials on highways, compared to 3,530 incidents involving transportation by rail. According to the report of the Legislative Analyst, during the period between 2005 and 2015 in California 92% of the costs associated with hazardous materials spills arose out of trucking accidents. Notably, however, that time period does not include the catastrophic 1991 Dunsmuir derailment.

Recognizing the danger of transporting hazardous materials by truck, SB 84 provides that equipment purchased using fees collected from rail shippers under SB 84 may be used to respond to spills resulting from trucking accidents. *See* Cal. Gov't Code § 8574.44(*i*). However, local governmental entities—rather than the truck owner or operator involved in the spill—must reimburse the state Fund for use of the equipment. Trucks transporting hazardous materials are required to pay a licensing fee, *see* Cal. Veh. Code § 32000.5, but the licensing and renewal fees—$100 and $75, respectively—are trivial in comparison to the per-rail-car fee on hazardous material shipments under SB 84. 13 Cal. Code Regs. § 1160.4(g)(2).

California could easily have imposed on railroads and trucking companies equivalent, or roughly equivalent, fees related to the transportation of hazardous materials. Indeed, it did so from 1991 to 1995, under a statute that imposed fees on both railroads and trucking companies. The proceeds were

deposited in the Rail Accident Prevention and Response Fund, which was then used to fund local hazardous waste response equipment and training. *See* Cal. Pub. Util. Code §§ 7713, 7714.5(e). Prior to the passage of SB 84, the California legislature considered and rejected a plan to finance the Fund in a similar manner, assessing fees against both railroads and trucking companies. Cal. State Assemb. 102, 2015 Assemb., Reg. Sess. (Cal. 2015). Instead of adopting such a plan, the legislature passed SB 84, assessing fees against only railroads.

Because the fees authorized by SB 84 favor trucking companies over railroads, they are not "fair" and do not come within the protection provided by § 5125(f)(1). We therefore agree with the Railroads and conclude that SB 84 is preempted by the ICCTA.

### 3. Dissenting View of Our Concurring Colleague

Our colleague concurs in the result, but dissents from our reasoning. According to our colleague's concurrence, § 5125(f)(1) is entirely preempted by the ICCTA insofar as it deals with shipment by rail. The concurrence concludes that any state-imposed fee related to the transportation by rail of hazardous materials is invalid, even if it is "fair." The concurrence makes a number of arguments in support of its conclusion. We respectfully disagree with them.

First, the concurrence argues that the ICCTA leaves no room for any state regulation of rates. The concurrence states that there has been "a century of federal laws making regulation of railroad rates the exclusive prerogative of the federal government." Conc. Op. at 31. Further, the concurrence cites a decision of the Surface Transportation

Board: "[A]ny state regulation of railroad rates is 'preempted regardless of the context or rationale for the action' because it is 'a *per se* unreasonable interference with interstate commerce.' " Conc. Op. at 33 (citing *CSX Transportation, Inc.—Petition for Declaratory Order*, STB Finance Docket No. 34662, 2005 WL 1024490, at *2–*3 (S.T.B. May 3, 2005)).

The concurrence states the matter too generally. We agree with the concurrence that the preemption provision of the ICCTA is broad. Indeed, we would entirely agree with the concurrence if the question were whether the ICCTA entirely preempts a State from regulating railroad rates when the State's only source of authority is a state law passed under its traditional police powers. But the question here is different. The question is whether a State has been authorized *by federal law* to charge a fair fee related to the transportation of hazardous materials. In our view, the text of that federal law, § 5125(f)(1), is clear. The legislative history of § 5125(f)(1), if we must resort to it, tells us that Congress intended afirmatively to authorize state-imposed fees related to the transportation of hazardous materials so long as they are "fair." Congress gave no indication that in enacting the broad preemption provision of the ICCTA it intended to preempt the fees that it had statutorily authorized only a year before.

Similarly, the Surface Transportation Board in *CSX Transportation* recited broad general principles:

> [There are] two broad categories of state and local actions to be preempted regardless of the context or rationale for the action. The first is any form of state or local permitting or

preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations . . . .

Second, there can be no state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service.

Both types of categorically preempted actions by a state or local body would directly conflict with exclusive federal regulation of railroads.

2005 WL 1024490 at *2–*3 (citations omitted). But the question actually at issue in *CSX Transportation* was narrow. The question was whether the District of Columbia could ban rail transportation of hazardous materials within a 2.2-mile radius of the United States Capitol Building. The District relied only on its police powers in support of its law. It cited no provision of the HMTA, or of any other federal statute, authorizing it to control railroad routes. Not surprisingly in that circumstance, the STB held that the ban was preempted.

Second, the concurrence argues that the text of the fee provision, as it was originally enacted in 1990, is unambiguous. It contends that § 5125(f)(1), as enacted in 1990, forbade States from imposing unfair fees and did not affirmatively authorize States to assess fair fees. According to the concurrence, the 1990 text did nothing more than "preclude[] states from exercising their legislative authority to impose inequitable fees in connection with hazardous

materials transportation." Conc. Op. at 44. The concurrence argues that because the recodification of § 5125(f)(1) in 1994 was not intended to work any substantive change, any ambiguity in the current wording of § 5125(f)(1) must be resolved by looking to the 1990 wording, which, in the view of the concurrence, was unambiguous. There are two problems with this argument.

The initial problem is that if the 1990 and 1994 texts of § 5125(f)(1) are substantively the same (as the concurrence agrees they are), the 1990 and 1994 wordings are equally authoritative. The 1990 text is ambiguous at best, and the legislative history shows that it was intended to provide affirmative authorization to the States to charge fair fees. The Committee Report for House Bill 3520 explained that the fees provision, as then worded, "would provide that a non-Federal governmental entity *may levy . . . fees*, but would require that . . . such . . . *fees be reasonable*[.]" H.R. Rep. No. 101-444, pt. 1, at 49 (emphasis added). The further problem is that the 1994 text, when considered *in paria materia* with syntactically identical provisions in the rest of the 1994 statute, is unambiguous in affirmatively authorizing States to charge fair fees related to the transportation of hazardous materials.

Third, the concurrence refuses to follow the rule of construction under which we give effect to the particular over the general. The rule directs us to compare the statutory provisions at issue, but the concurrence does not do so. Instead, the concurrence considers the particular issue being litigated rather than the actual statutory provisions: "Because the only question here is whether the HMTA supercedes ICCTA on the issue of regulating railroad rates, our focus must be on how the two statutes address that particular issue."

Conc. Op. at 38. The concurrence focuses only on the word "rates," ignoring the other words in the preemption provision of the ICCTA that make clear the generality of the statute. The statutory provision, which the concurrence would have us ignore, is extremely broad, covering "transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules . . . . , practices, routes, services and facilities of such carriers; . . . ." 49 U.S.C. § 10501(b). Section 5125(f)(1), by contrast, is fairly narrow, authorizing only fees for the transportation of hazardous materials, and only fees that are "fair."

Fourth, the concurrence would read § 5125(f)(1) into oblivion. The concurrence would read § 5125(f)(1) to permit the State to assess fees from shippers of hazardous materials by truck, but to forbid the State to assess any fees whatsoever from shippers of such materials by rail. But if it is unfair to charge fees only for shipment by rail, it is equally unfair to charge fees only for shipment by truck. Under the concurrence's interpretation of § 1525(f)(1) there would be no possibility of a fair fee. In effect, the concurrence would read § 5125(f)(1) out of the U.S. Code. We do not believe Congress intended § 5125(f)(1) to suffer such a fate.

The concurrence disagrees, based on alternative contentions. The concurrence contends that although the State cannot require a railroad to charge fees and then remit those fees to the State, the State could assess those fees directly from the shippers. The concurrence relies in part on a "suggestion" by the Railroads. Conc. Op. at 42 ("[T]he railroads have suggested that if the state collected a charge from the shippers directly . . . the charge would not be subject to STB jurisdiction and would not qualify as a rate."). We disagree that the Railroads have made such a suggestion, in

the sense of endorsing it. The most that the Railroads have done is point out that we would have a different case if the State were to collect the fee directly, and then to argue strenuously that, however that case might come out, this case is easy because the Railroads cannot be required to collect the fee themselves. *See* Appellees' Brief at 28 ("*If* the ICCTA permits a State to impose a hypothetical charge directly on rail shippers, it would be *because the STB has no jurisdiction over the direct charge.*") (first emphasis added).

We are skeptical that the ICCTA would allow the State to do directly what it cannot do indirectly. To allow a State to charge a shipper a fee directly but to forbid it to charge the same fee indirectly would be to choose form over substance. Whether a shipper pays a fee directly to the State or pays the fee to a railroad for remittance to the State, the economic consequence is the same. Under either alternative, the fee is part of the price the shipper pays to transport its hazardous material by rail. As we wrote in *Sanchez v. Aerovias de Mexico, S.A.*, 590 F.3d 1027, 1030 (9th Cir. 2010), " '[I]t is freshman-year economics that higher prices mean lower demand, and that consumers are sensitive to the full price that they must pay, not just the portion of the price that will stay in the seller's coffers.' " (quoting *Buck v. Am. Airlines, Inc.*, 467 F.3d 29, 36 (1st Cir. 2007)).

In the alternative, the concurrence contends that assessing a fee solely against the trucking industry would be fair "[s]o long as California imposes a fee on truck shipments of hazardous waste that is commensurate with the danger posed by such shipments." Conc. Op. at 41. According to the concurrence, charging a fee for all shipments of hazardous materials by truck while charging no fee whatsoever for such shipments by rail would be "commensurate" with the dangers

posed by the two methods of shipping. It is not true that charging no fee whatsoever to shippers by rail would be "commensurate" and therefore "fair."

As is made clear from the record, shipment by truck and shipment by rail both pose very serious risks. The concurrence relies on the Legislative Analyst's report to suggest that 92% of the costs of spills might properly be allocated to trucks as "commensurate" with the risk. Conc. Op. at 41. The Analyst's report did state that 92% of the costs associated with hazardous materials spills in California were due to trucking accidents, but the period at issue was 2005 to 2015. The record is clear that railroad accidents, while less frequent than trucking accidents, are often catastrophic when they do occur. Such accidents include the Dunsmuir pesticide spill in California in 1991 (outside the 2005–2015 period considered in the Analyst's report), the oil spill in Mosier, Oregon, in 2016, and several other catastrophic railroad accidents documented in the record. In the case of the Dunsmuir spill, clean up costs and other damages were paid only after the fact and only after suit was brought. As recounted above, the suit was settled for $38,000,000.

The concurrence contends that it would be "commensurate," and therefore "fair," to recover clean up costs by two different methods—assessing up-front per-shipment fees from truckers, but requiring after-the-fact litigation for any money paid by railroads. The two methods of payment are based on different theories of liability. An up-front, per-shipment system is a no-fault system. Truckers pay the fee regardless of fault, and the collected fees are used to clean up spills regardless of fault. By contrast, an after-the-fact, litigation-based system is a fault-based system.

Railroads would be required to pay for spills only if found at fault for the spill. It would hardly be "fair" to subject the trucking industry to no-fault liability while subjecting railroads only to a fault-based liability.

## C. Dormant Commerce Clause

Because we hold that SB 84 is preempted on statutory grounds, we need not decide whether it is invalid under the dormant Commerce Clause.

## D. Irreparable Harm, Balance of Equities, and Public Interest

The district court found that the Railroads would suffer irreparable harm if an injunction did not issue because some shippers would choose to ship hazardous materials by truck, or by other means, in order to avoid paying the fees mandated in SB 84. The district court further found that a weighing of the equities favored the Railroads. It acknowledged that fees collected during the pendency of this lawsuit could fund additional accident preparedness, which could help avert future damage to Californians and to the environment. It concluded, however, that these benefits were more speculative, and therefore less weighty, than the economic harms to the Railroads. The district court did not abuse its discretion in so concluding. Finally, the district court found that the injunction was consistent with the public interest. It did not abuse its discretion in so finding.

Conclusion

We conclude that the district court did not abuse its discretion in entering a preliminary injunction against the implementation of SB 84.

**AFFIRMED.**

---

IKUTA, Circuit Judge, dissenting in part:

In contradiction to a century of federal laws making regulation of railroad rates the exclusive prerogative of the federal government, *see, e.g.*, *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1029 (9th Cir. 1998), the majority today rules that states have the authority to regulate railroad rates. One would expect clear authorization from Congress before making such an unprecedented ruling, but the majority merely points to a federal statute providing that states may impose fees on the transportation of hazardous materials only if the fees are fair. In reaching this conclusion, the majority not only misreads the federal statutes at issue, but blunders in its application of longstanding rules for harmonizing federal statutes. I dissent.

I

"Railroads have been subject to comprehensive federal regulation for [more than] a century." *United Transp. Union v. Long Island R.R. Co.*, 455 U.S. 678, 687 (1982), *overruled on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985). In the late 19th century, federal regulation of railroad rates was "deemed necessary for the

protection of the interests of the people to control and circumscribe the exercise of the monopoly powers of [railway] corporations," and to prevent railroads "from making extortionate charges and unlawful exactions upon the people." H.R. Rep. No. 49-902, at 2 (1886). Accordingly, Congress enacted the Interstate Commerce Act of 1887 (ICA), which provided that "[a]ll charges made for any service rendered or to be rendered in the transportation of passengers or property [by rail], . . . shall be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful." Interstate Commerce Act of 1887, ch. 104, 24 Stat. 379, 379. To enforce this federal regulation of railroad rates, Congress created the Interstate Commerce Commission (ICC) and endowed it with the power to determine "the reasonableness of a published rate." *Ariz. Grocery Co. v. Atchison, T. & S. F. Ry. Co.*, 284 U.S. 370, 384 (1932). With later amendments in the 1920s, Congress "granted the [ICC] power to fix the maximum reasonable rate . . . or the maximum and minimum limits within which the carriers' published rate must come." *Id.* at 386. Thus, the ICC became "the first great federal regulatory rate-setting agency." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1388 (2015) (Breyer, J., concurring).

A century later, Congress enacted the ICC Termination Act of 1995 (ICCTA), which built on the ICA and reinforced the policies that "promoted growth and stability in the surface transportation sector." H.R. Rep. No. 104-311, at 93 (1995). ICCTA retained the federal government's exclusive authority to regulate the rates of rail carriers, *see* 49 U.S.C. § 10501(b); it merely shifted the ICC's rate-setting authority to a newly created agency, the Surface Transportation Board (STB), *see* ICC Termination Act of 1995, Pub. L. No. 104-88,

§§ 701–02, 109 Stat. 803, 932–34.  The STB's jurisdiction over specified interstate rail functions, including railroad "rates," is "exclusive and preempt[s] the remedies provided under Federal or State law."  49 U.S.C. § 10501(b).

"It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations."  *City of Auburn*, 154 F.3d at 1030 (citation omitted).  We have held that "ICCTA preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation."  *Assoc. of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1098 (9th Cir. 2010) (quoting *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007)).  As a result, any state regulation of railroad rates is "preempted regardless of the context or rationale for the action" because it is "a *per se* unreasonable interference with interstate commerce."  *CSX Transp., Inc.—Petition for Declaratory Order*, STB Finance Docket No. 34662, 2005 WL 1024490, at *2–*3 (S.T.B. May 3, 2005); *see Assoc. of Am. R.R.*, 622 F.3d at 1097 (stating that we owe *Chevron* deference to the STB's interpretations of ICCTA).

The majority has determined that under SB 84, "fees are paid by shippers as part of the price for shipping hazardous materials by rail" and the fees are collected by railroads; they therefore constitute "'rates' within the meaning of § 10501(b)."  Maj. Op. at 9.  Because SB84 governs railroad rates, it is per se unreasonable and preempted by ICCTA.  That's the end of the matter.

II

The majority's conclusion that the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101–5128 (HMTA), saves SB 84 from being preempted by ICCTA has no basis in the language of HMTA and is contrary to Congress's longstanding determination that "only the Federal Government, not the states, could regulate the interstate rates of railroads," *United Transp. Union*, 455 U.S. at 687 (citing *Wabash, St. L. & P. Ry. Co. v. Illinois*, 118 U.S. 557 (1886)).

A

HMTA does not purport to regulate railroad rates. Rather, HMTA's stated purpose is to "protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material in intrastate, interstate, and foreign commerce."  49 U.S.C. § 5101. HMTA accomplishes this goal by, among other things, authorizing the Secretary of Transportation to "prescribe regulations for the safe transportation . . . of hazardous material." *Id.* § 5103(b)(1).  HMTA thus federalizes certain aspects of hazardous materials transportation and limits state intrusion into those areas.  *See The Transportation of Hazardous Materials: Hearing on S. 261 Before the Subcomm. on Surface Transp. of the S. Comm. on Sci., Commerce, and Transp.*, 101st Cong. 30 (1990) (statement of Travis P. Dungan, Administrator, Research and Special Programs Administration, Department of Transportation) ("[O]ur bill proposes that certain areas be carved out exclusively for Federal regulation.").

To accomplish this goal, HMTA identifies several categories of requirements (such as requirements for

packaging and labeling hazardous materials and reporting releases of the same) imposed on persons transporting hazardous materials and preempts any state law that does not have the same substantive content as federal regulations pertaining to the same subject. *See* 49 U.S.C. § 5125(b).[1]

---

[1] HMTA's preemption provision provides, in pertinent part:

Except as provided in [a subsection relating to highway routing] and unless authorized by another law of the United States, a law, regulation, order, or other requirement of a State, political subdivision of a State, or Indian tribe about any of the following subjects, that is not substantively the same as a provision of this chapter, a regulation prescribed under this chapter, or a hazardous materials transportation security regulation or directive issued by the Secretary of Homeland Security, is preempted:

(A) the designation, description, and classification of hazardous material.

(B) the packing, repacking, handling, labeling, marking, and placarding of hazardous material.

(C) the preparation, execution, and use of shipping documents related to hazardous material and requirements related to the number, contents, and placement of those documents.

(D) the written notification, recording, and reporting of the unintentional release in transportation of hazardous material and other written hazardous materials transportation incident reporting involving State or local emergency responders in the initial response to the incident.

(E) the designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning,

Congress did not preempt all areas of state regulation, however. *See The Transportation of Hazardous Materials: Hearing on S. 261 Before the Subcomm. on Surface Transp. of the S. Comm. on Sci., Commerce, and Transp.*, 101st Cong. 30 (1990) (statement of Travis P. Dugan, Administrator, Research and Special Programs Administration, Department Of Transportation) ("Our bill also recognizes the interests of the state and local governments in the transportation of hazardous materials. We provide that state and local laws and regulations may address anything that does not fall under the areas of Federal jurisdiction."). HMTA does not list fees imposed on shippers to transport hazardous materials as one of the subjects that must have the same substantive content as federal law, *see* 49 U.S.C. § 5125(b), and so fee provisions are not preempted by HMTA.

Nevertheless, Congress sought to ensure that any fee imposed by a state was reasonable and that the revenues derived from such fees were used for hazardous materials transportation purposes. As such, HMTA provides that "[a] State, political subdivision of a State, or Indian tribe may impose a fee related to transporting hazardous material only if the fee is fair and used for a purpose related to transporting hazardous material, including enforcement and planning, developing, and maintaining a capability for emergency response." 49 U.S.C. § 5125(f)(1). For reasons explained below, § 5125(f)(1) is best interpreted as a congressional

---

repairing, or testing a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce.

49 U.S.C. § 5125(b)(1).

determination that state laws imposing fees relating to transporting hazardous materials will not be preempted by HMTA, so long as such fees are fair. The majority holds otherwise, claiming that § 5125(f)(1) constitutes Congress's affirmative grant of authority to states to impose fees relating to transporting hazardous materials. Maj. Op. at 14. But our interpretative disagreement is not material. The only question that matters here is whether § 5125(f)(1) allows states to impose rates on railroads in contradiction of the STB's exclusive jurisdiction. Regardless whether § 5125(f)(1) is limiting or empowering, the answer to that question is clearly no.

## B

"When confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (citation omitted). As with other conflicting federal laws, "[i]f an apparent conflict exists between ICCTA and a federal law, then the courts must strive to harmonize the two laws, giving effect to both laws if possible." *Assoc. of Am. R.R.*, 622 F.3d at 1097 (emphasis omitted). Under the rules applicable to harmonizing federal laws, "[w]here there is no *clear* intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987) (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976)); *see Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384–85 (1992). Further, a general savings clause in one statute "cannot be allowed to supersede the specific

substantive pre-emption provision" of another.  *Morales*,
504 U.S. at 385.

Applying these rules here, ICCTA necessarily supersedes
HMTA as to the authority for setting railroad rates.
According to the majority's interpretation, HMTA gives
states the general authority to "impose a fee related to
transporting hazardous material" if fair.    49 U.S.C.
§ 5125(f)(1).   ICCTA, by contrast, prohibits states from
enacting "laws that may reasonably be said to have the effect
of managing or governing *rail transportation*," *Assoc. of Am.
R.R.*, 622 F.3d at 1097 (emphasis added) (citation omitted),
and gives the STB exclusive authority to regulate *railroad
rates*, 49 U.S.C. § 10501(b).  ICCTA's specific provisions
prohibiting states from imposing rates on railroads are not
superseded by HMTA's general provisions regarding state
fees relating to hazardous material transportation.     In
contending that ICCTA's preemption provision is "broad and
general," while HMTA's authorization is "narrow and
specific," Maj. Op. at 19–20, the majority misses the context
in which the question arises.  Because the only question here
is whether HMTA supersedes ICCTA on the issue of
regulating railroad rates, our focus must be on how the two
federal statutes address that particular issue.  Here, ICCTA is
specific to railroads and directly targets railroad *rates*.  It also
expressly preempts all state and federal laws that govern
railroad rates, and gives the STB exclusive jurisdiction over
those rates.   By contrast, HMTA generally governs fees
relating to hazardous materials transportation of all sorts and
does not suggest that it supersedes any federal law.  HMTA's
vague statements regarding fair fees and hazardous materials
transportation "cannot be allowed to supersede the specific

substantive pre-emption provision" of ICCTA. *Morales*, 504 U.S. at 385.**[2]**

Moreover, "[a] party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow. The intention must be 'clear and manifest.'" *Epic Sys.*, 138 S. Ct. at 1624 (citations omitted). ICCTA is clear that it preempts all "rates" governing railroad transportation, including any federal laws governing such rates. 49 U.S.C. § 10501(b) (the STB's jurisdiction over railroad rates is "exclusive" and preempts "Federal or State law" that conflicts with this exclusive jurisdiction). By contrast, HMTA's "authorization" is at best a permission, and more likely a limit on state power. Either way, there is no evidence that Congress intended HMTA to supersede conflicting federal law applying to railroad rates or to intrude on the STB's exclusive jurisdiction. The majority fails to explain how HMTA manifests Congress's clear intent that a provision regarding fair fees should supersede ICCTA's exclusive regulation of railroad rates.

Finally, at the time HMTA was enacted in 1975, the federal regulation of railroad rates had been established for almost 100 years (since 1887) and regulation of railroad rates had been the exclusive province of federal agencies for over

---

**[2]** The majority argues that because ICCTA broadly regulates railroad operations, it is more general than § 5125(f)(1), which references fees for the transportation of hazardous materials. Maj. Op. at 27. This is mere word play. While ICCTA may be a more general statute compared to a federal statute governing a specific aspect of railroad operations, it is not a more general statute compared to a federal statute governing transportation of hazardous materials by any means.

50 years (since 1920).  *See Ariz. Grocery Co.*, 284 U.S. at 383–86.  And yet, HMTA does not mention railroad rates at all.  There is a "'stron[g] presum[ption]' that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys.*, 138 S. Ct. at 1624 (alterations in original) (quoting *United States v. Fausto*, 484 U.S. 439, 452, 453 (1988)).  The majority provides no evidence to overcome this presumption here.

The majority's contrary arguments are without support.  For example, the majority claims that federalism requires a presumption against preemption here, but this is plainly incorrect.  The presumption applies when federal law governs "state rules in areas of traditional state regulation." Maj. Op. at 19 (quoting *Massachusetts v. U.S. Dep't of Transp.*, 93 F.3d 890, 894 (D.C. Cir. 1996)).  As is evident from above, states have not traditionally regulated railroad rates.  "Just as the Federal Government cannot usurp traditional state functions, there is no justification for a rule which would allow the states . . . to erode federal authority in areas traditionally subject to federal statutory regulation." *United Transp. Union*, 455 U.S. at 687.  Railroad rates fall squarely into the latter category.  *Id.*  Even before the Interstate Commerce Act, the Court "held that only the Federal Government, not the states, could regulate the interstate rates of railroads." *Id.* (citing *Wabash, St. L. & P. R. Co. v. Illinois*, 118 U.S. 557 (1886)).  Therefore, the presumption is inapplicable here.

The majority also argues that Congress did not intend ICCTA to supersede HMTA with respect to railroad rates because that "would read § 5125(f)(1) into oblivion."  Maj.

Op. at 27. This argument is simply false. The STB's exclusive jurisdiction over rates applies only to railroads, not to other means of transporting hazardous materials. *See* 49 U.S.C. § 10501(a)(1) ("[T]he Board has jurisdiction over transportation by rail carrier . . . ."). The majority's claim that "if it is unfair to charge fees only for shipment by rail, it is equally unfair to charge fees only for shipment by truck," Maj. Op. at 27, is baseless. Trucks have historically been a significant source of hazardous waste spills in California; as the majority acknowledges, "during the period between 2005 and 2015 in California 92% of the costs associated with hazardous materials spills arose out of trucking accidents."[3] Maj. Op. at 22. So long as California imposes a fee on truck shipments of hazardous waste that is commensurate with the danger posed by such shipments (rather than including any extra amounts needed to address potential future occurrences of railroad spills), such a fee would not be unfair to truckers.[4] California can recover the costs of addressing the rare railroad spill through litigation and settlement, as it did in the 1991 Dunsmuir derailment identified by the majority.[5]

---

[3] By contrast, the majority identifies a single major railroad spill that took place in California 27 years ago. Maj. Op. at 21.

[4] In other words, California could impose a fee on truckers that is calculated to collect the costs of responding to spills caused by truck shipments of hazardous materials. Such a fee would be commensurate with the danger posed by truck shipments of hazardous materials.

[5] See Memorandum of Agreement settling *California ex rel. Wheeler v. Southern Pacific Transportation Company, Inc.*, No. S-92-1117-LKK-GGH, and *United States v. Southern Pacific Transportation Company, Inc.*, No. S-92-2090-WBS-GGH, 1994 (settling damages caused by the Dunsmuir derailment for $38 million), available at https://www.cerc.usgs.gov/orda_docs/CaseDetails?ID=946.

Moreover, the STB's jurisdiction applies only to "rates," not to fees that are not rates. If, for instance, a state followed the lead of the federal government and required shippers transporting hazardous materials to file a registration statement and pay "a fee necessary to pay for the costs" of processing that statement, 49 U.S.C. § 5108(g), a court could reasonably conclude that such a charge was not part of the price for shipping hazardous materials by rail and therefore was not a rate. Maj. Op. at 9.

Similarly, the STB's jurisdiction applies to rail carriers, or entities "acting under the auspices of a rail carrier," not to noncarriers. *See., e.g.*, *Valero Ref. Co.—Petition for Declaratory Order*, STB Finance Docket No. 36036, 2016 WL 5904757, at *3 (Sept. 20, 2016). Accordingly, the railroads have suggested that if the state collected a charge from the shippers directly (instead of requiring the railroads to do so, as in this case) the charge would not be subject to STB jurisdiction and would not qualify as a rate.[6] If a charge

---

[6] Although the majority states it is "skeptical that the ICCTA would allow the State . . . to charge a shipper a fee directly but to forbid it to charge the same fee indirectly," Maj. Op. at 28, the STB has indicated "there is no preemption" under ICCTA when a state or local government entity regulates a third party that is neither a rail carrier nor acting under the auspices of a rail carrier. *See Valero Ref. Co.*, 2016 WL 5904757, at *3. Further, in *Sanchez v. Aerovias De Mexico, S.A. De C.V.*, we placed great weight on the fact that a Mexican tourism tax was collected by an airline, rather than directly by the Mexican government. 590 F.3d 1027, 1030 (9th Cir. 2010). *Sanchez* concluded the tax was part of the airline's "ticketed price," and therefore the suit against the airline for wrongful collection of the tax was preempted by the Airline Deregulation Act, *id.*, which preempts suits against airlines "related to a price, route, or service of an air carrier," 49 U.S.C. § 41713(b)(1). As these examples indicate, a federal law's preemption of state regulation of common carriers generally does not extend to state regulation of noncarriers. Accordingly,

is not a rate, the state may impose it under HMTA so long as it is fair, and ICCTA would have no bearing on these fees. But once a state tries to impose a fee that is actually a railroad rate, it is categorically preempted by ICCTA and falls within the STB's exclusive jurisdiction.

Stated succinctly, the majority offers no plausible basis for its conclusion that some railroad rates are not subject to the STB's exclusive jurisdiction, when federal law dictates that all state and federal regulation of railroad rates is preempted by ICCTA.

C

The majority's conclusion that HMTA's fee provision supersedes the STB's exclusive jurisdiction is wrong for another reason: HMTA can be read so that it does not conflict with ICCTA at all. Instead of applying the rules for harmonizing apparently conflicting federal statutes, the majority makes the bare assertion that "the ICCTA and the HMTA are easily harmonized by reading § 5125(f)(1) of the HMTA to protect from preemption the fees specifically authorized in that section." Maj. Op. at 11. Obviously, this does not harmonize the statutes, it merely chooses HMTA over ICCTA. In other words, the majority purports to harmonize the two federal statutes by ruling that HMTA's fee provision supersedes ICCTA's exclusive regulation of railroad rates, and therefore that states can impose fair fees, even when they conflict with the STB's exclusive jurisdiction. This would require altering ICCTA's language

§ 5125(f)(1) maintains effect even if it is superseded by ICCTA's preemption provision when a fee crosses the line into a rate collected by a railroad.

to read that the STB's exclusive jurisdiction over railroad "rates" does not cover fair fees imposed on the transportation of hazardous materials.

HMTA's fee provision can be given effect without reading it as an authorization or altering its language. When the fee provision was first enacted in 1990, it read:

> A State or political subdivision thereof or Indian tribe *may not* levy any fee in connection with the transportation of hazardous materials *that is not equitable* and not used for purposes related to the transportation of hazardous materials, including enforcement and the planning, development, and maintenance of a capability for emergency response.

Hazardous Materials Transportation Uniform Safety Act of 1990, Pub. L. 101-615, § 112, 104 Stat. 3244, 3260 (emphasis added). In other words, HMTA precluded states from exercising their legislative authority to impose inequitable fees in connection with hazardous materials transportation.[7]

In making wholesale amendments to Title 49 (including HMTA) four years later, Congress clarified that these revisions were designed to revise and codify "general and

---

[7] The majority claims that the text of the fee provision as first enacted in 1990 is "ambiguous at best." Maj. Op. at 26. But because it provides that a state "*may not* levy any fee in connection with the transportation of hazardous materials that is not equitable," Hazardous Materials Transportation Uniform Safety Act of 1990, Pub. L. 101-615, § 112, 104 Stat. 3244, 3260, there is no plausible way to read it as granting states authority to impose fees, and the majority does not try to do so.

permanent laws of the United States, related to transportation . . . *without substantive change*." Revision of Title 49, United States Code Annotated, "Transportation," Pub L. 103-272, 108 Stat. 745 (1994) (emphasis added). As part of this general revision, the statutory language in HMTA preventing the imposition of unfair fees was revised to its current state, and provides that "[a] State, political subdivision of a State, or Indian tribe may impose a fee related to transporting hazardous material only if the fee is fair . . . ." 49 U.S.C. § 5125(f)(1).

Read in isolation, the current version of § 5125(f)(1) is ambiguous. Given that "state governments do not need [federal] authorization to act," *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535 (2012), this language most likely means that a state may enact a law imposing a fee only if the fee is fair. As the majority argues, however, it could be read as affirmatively authorizing states to enact laws imposing fees so long as they are fair. In support of this latter interpretation, the majority notes that "[t]he syntactical structure of § 5125(f)(1)—a person or entity 'may' perform some act 'only if' some criterion is satisfied—is used repeatedly and consistently in the HMTA" as an authorization. Maj. Op. at 14. But we are not reading this statutory language in isolation; rather, we must read it in light of Congress's statement that the 1994 revisions were not intended to make a substantive change from the original wording—that a state "may not levy any fee . . . that is not equitable." Hazardous Materials Transportation Uniform Safety Act of 1990, Pub. L. 101-615, § 112, 104 Stat. 3244,

3260.[8] This language can only be interpreted as a limitation on state power.

Moreover, our "[r]espect for Congress as drafter counsels against too easily finding irreconcilable conflicts in its work" because "[a]llowing judges to pick and choose between statutes risks transforming them from expounders of what the law *is* into policymakers choosing what the law *should be*." *Epic Sys.*, 138 S. Ct. at 1624. With the goal of harmonization in mind, and armed with the original statutory language as a limitation on state power, we should read § 5125(f)(1) as a limitation, rather than an authorization to impose fair fees. In fact, we are bound to do so. *See id.* As a limitation on state power, § 5125(f)(1) does not conflict with the STB's exclusive jurisdiction, and we are not tasked with choosing between two laws posing an irreconcilable conflict.

---

[8] For similar reasons, the majority's attempt to distinguish *Township of Tinicum v. U.S. Department of Transportation*, 582 F.3d 482 (3d Cir. 2009), is unconvincing. In *Tinicum*, the Third Circuit reasoned that similar text in the Anti-Head Tax Act (AHTA) was not an authorization, but a limitation. *Id.* at 488–89. The AHTA provides that states "*may* levy or collect a tax on or related to a flight of a commercial aircraft or an activity or service on the aircraft *only if* the aircraft takes off or lands in the State or political subdivision as part of the flight." 49 U.S.C. § 40116(c) (emphasis added). *Tinicum* reasoned, in part, that the language should be interpreted as a limitation on state power because a predecessor statute could be read only as a limitation, and no substantive change was intended when the language changed. 582 F.3d at 487. To the extent *Tinicum* bears on the interpretative question presented here, it supports reading HMTA as a limitation rather than an authorization. Like in *Tinicum*, there is an undisputed meaning of an earlier verison of the statute upon which "we must 'primarily' rely in interpreting the language." Maj. Op. at 14.

To counter this straightforward approach to harmonizing ICCTA and HMTA, the majority relies heavily on a 1990 report from the Committee on Energy and Commerce on H.R. 3520, which discusses a version of the revisions to HMTA that was not enacted by Congress. *See* Maj. Op. at 16–18, 26. The majority excerpts language stating that the fee provision of a predecessor bill to HMTA "would provide that a non-Federal governmental entity *may levy . . . fees*, but would require that . . . such . . . *fees be reasonable*[.]" H.R. Rep. No. 101-444, pt. 1, at 49 (1990) (emphasis added).[9]  But this language is likewise ambiguous; it does not expressly indicate whether the bill authorizes state regulation or merely permits the state to exercise its inherent police powers.  The context of the report, however, indicates that the legislators understood the proposed bill to be permissive.

Nothing in this section of the report suggests that H.R. 3520 granted states authority to impose fees that it did not already have.  As noted above, "state governments do not need [federal] authorization to act," *Nat'l Fed'n of Indep.*

---

[9] The full language from the report provides that states may exercise the full range of enforcement authority typically exercised by states; it does not give states any special authorization as the majority suggests:

> Section 112(b) of the HMTA, as amended by the bill, would provide that *a non-Federal governmental entity may levy fines, penalties, and fees, but would require that (1) such fines, penalties, or fees be reasonable*; and (2) the revenues derived therefrom must be used exclusively for hazardous materials transportation purposes (including enforcement and the planning, development, and maintenance of a capability for emergency response).

H.R. Rep. No. 101-444, pt 1 at 49 (emphasis added).

*Bus.*, 567 U.S. at 535, and this section of the report focuses on states' lawmaking power, *notwithstanding* the HMTA. It discusses, for instance, the procedure whereby a state could apply to the federal government for a determination of whether its law was preempted, and disclaims any intent to "pre-approve State and local requirements before such requirements obtain the force of law." H.R. Rep. No. 101-444, pt. 1, at 49. In other words, the report supports the reading that legislators recognized that states retained the power to impose fees, but limited that authority by ensuring any fee is fair.[10]

In short, HMTA does not evince a clear intent to supersede ICCTA. Because we must give effect to both ICCTA and HMTA if possible, and because there is a reading of HMTA that retains its effect of allowing state fees only when fair, we are bound to interpret the provision that way. The majority errs in holding otherwise and creating an unnecessary conflict.

---

[10] The majority relies on a statement in the report on H.R. 3520 (Section 18, State Participation) discussing a section in the proposed bill that would allow states to participate in carrying out investigative and surveillance activities in connection with federal regulations pertaining to rail safety. Maj. Op. at 18 (discussing H.R. Rep. No. 101-444, pt. 1, at 53–54). This section of the bill was intended to overturn judicial rulings interpreting provisions of the Federal Railroad Safety Act (FRSA) to preclude states from adopting any laws relating to the transportation of hazardous materials based on FRSA's preemption provision. H.R. Rep. No. 101-444, pt. 1, at 53–54 (citing *CSX Transp., Inc. v. Pub. Utils. Comm'n of Ohio*, 701 F. Supp. 608, 612 (S.D. Ohio 1988), *aff'd*, 901 F.2d 497 (6th Cir. 1990)). This issue has no bearing on the question whether HMTA was intended to override the STB's exclusive jurisdiction over railroad rates.

The majority does not provide a single plausible basis for its claim that § 5125(f) supercedes ICCTA and could save a state law regulating railroad rates from preemption. The STB's broad, exclusive jurisdiction over railroad rates, and ICCTA's express preemption of state and federal law, contradicts such a claim. I therefore dissent.